**UNITED STATES of America, Appellee,**

v.

**Michael LEE, Defendant–Appellant.**

**No. 1500, Docket 89–1608.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 15, 1990.

Decided Oct. 17, 1990.

Herbert L. Greenman (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y., of counsel), for defendant-appellant.

Thomas S. Duszkiewicz, Asst. U.S. Atty., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., of counsel), for appellee.

Before MINER and ALTIMARI, Circuit Judges, and KELLEHER, District Judge.*

ALTIMARI, Circuit Judge:

Defendant-appellant Michael Lee appeals from a judgment of conviction, entered in the United States District Court for the Western District of New York, finding him guilty of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988).

On this appeal, Lee argues that his conviction should be reversed because the district court improperly denied his motion to suppress cocaine recovered from his suitcase. Specifically, Lee complains that the district court erred in finding that he abandoned his suitcase and therefore was with-

---

* Honorable Robert J. Kelleher, of the United States District Court for the Central District of California, sitting by designation.

out basis under the fourth amendment to challenge its opening. In the alternative, Lee contends that his abandonment of the suitcase was tainted by police conduct which ran afoul of the fourth amendment. Thus, the central issues presented are whether the district court properly found that Lee voluntarily abandoned his suitcase, thereby forfeiting any reasonable expectation of privacy in it, and whether the abandonment was a consequence of police conduct which violated Lee's fourth amendment rights.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

On January 9, 1988, Niagara Frontier Transit Authority Police Officer Thomas Gerace was on patrol at Buffalo International Airport. While discussing an unrelated investigation with USAir Shift Supervisor Leo Amigone, Officer Gerace observed a man, dressed in a black sweater, black woolen pants and a three-quarter length black leather coat, purchasing a ticket at the USAir ticket counter. The man, who was subsequently identified as defendant-appellant Michael Lee, appeared nervous and continually stared at the uniformed Gerace; whenever Gerace looked directly at Lee, Lee averted his eyes.

Gerace left the USAir terminal for approximately five minutes. Upon his return, he again noticed Lee, who was now carrying a maroon suitcase with a large scripted "L" monogram. As Lee proceeded up an escalator to the flight departure area, he continued to stare at Gerace, at times looking over his shoulder to do so. On the way to the departure area, Lee passed through a security check point, which required that he place his suitcase through an x-ray machine. Officer Gerace, who was now following Lee, observed that the image produced by the x-ray machine seemed to show that the maroon suitcase was empty, except for a "walkman" type radio and toiletry articles. Once in the departure lounge, Gerace watched as Lee removed his black leather jacket and easily placed it into his suitcase.

After Lee's departure, Officer Gerace learned from USAir Supervisor Amigone that Lee was flying to Tampa, Florida and was scheduled to return on January 11 (one and one-half days after his departure). Further, Lee was traveling under the name B. Jackson and had paid for his $410 round-trip fare all in $10 bills. Based on this information, as well as his observations, Officer Gerace contacted Buffalo Police Officer Philip Torre, who was assigned to the Drug Enforcement Administration ("DEA") Task Force. Upon Officer Gerace's recitation of the facts, Officer Torre decided that further investigation was warranted and that it would be worthwhile to observe Lee as he arrived from Tampa. Accordingly, on January 11, 1988, Officer Torre, accompanied by DEA Special Agent Robert Niczyporowicz and Erie County Deputy Sheriff Paul Terranova, met Officer Gerace at the USAir terminal. All four officers were dressed in plain clothes. The officers watched as passengers deplaned Lee's scheduled flight. When Lee emerged from the plane, Gerace pointed him out to the other officers and also informed them that Lee was wearing the same clothing he had worn when he departed. Lee, however, was no longer carrying the maroon suitcase; the only baggage he now carried was a brown paper shopping bag.

The officers followed as Lee walked through the terminal and then down an escalator leading to both the baggage claim area and the terminal's exit. As Lee turned toward the exit, Officers Niczyporowicz and Torre approached him and, with credentials displayed, asked if they could speak with him. Lee consented. Officer Niczyporowicz then suggested that they move out of the flow of traffic to a more private area. Lee agreed, and the three men walked a distance of approximately twenty-five feet to a corner of the main terminal.

Officer Niczyporowicz began the interview by asking Lee what his name was; Lee responded that it was Michael Lee. The officer, believing that Lee was traveling under the name B. Jackson, requested to see some identification. Lee produced a

Florida driver's license in the name of Michael Lee; the license also showed a Florida address. In response to further questions, Lee informed the officers that he had flown to Tampa to visit a sick sister. Lee was next asked to produce his plane ticket; the ticket bore the name B. Jackson. When Officer Niczyporowicz requested an explanation, Lee maintained that B. Jackson was a cousin whom he had traveled with on January 9. Niczyporowicz then asked if Lee had taken any luggage on his trip to Tampa. Lee indicated that he only brought a brown paper bag which he had carried on the plane. Officer Torre inquired if Lee had returned from Tampa with any luggage other than the brown paper bag he was carrying. Lee said he had no other luggage. Niczyporowicz then asked Lee whether he had any luggage that he had not yet claimed. Again, Lee responded negatively.

Eventually, Lee asked why he was being questioned and was informed by Officer Niczyporowicz that he was suspected of carrying contraband. Lee immediately offered to permit the officers to search him and his paper bag. The resulting search failed to uncover any contraband.

Meanwhile, Officer Gerace and Deputy Sheriff Terranova were waiting just outside the baggage claim area, approximately twenty-five feet from where the interview was being conducted. From this vantage point, Officer Gerace noticed a maroon suitcase with a large scripted "L" monogram on the USAir baggage carousel. Officer Gerace informed Officers Torre and Niczyporowicz that he believed he had located the suitcase Lee had carried when he departed Buffalo. A short while later, a USAir employee removed the maroon suitcase from the carousel, along with three other unclaimed bags, and placed them on a baggage rack. Gerace also reported this to Torre and Niczyporowicz. Hearing this information, Officer Niczyporowicz told Lee that a maroon suitcase, believed to be his, was sitting in the baggage claim area. Lee denied knowing anything about the suitcase.

After informing Niczyporowicz and Torre about the maroon suitcase, Officer Gerace sought out a USAir employee who could explain the airline's policy regarding unclaimed baggage. Gerace located USAir Shift Supervisor Amigone and asked if he would accompany him to the baggage claim area to speak with the officers about USAir's baggage claim policies. While Officer Torre waited with Lee, Amigone told the other officers that USAir's policy was to open unclaimed baggage that contain no visible identification, in an attempt to ascertain the owner. Officer Niczyporowicz then told Amigone that the officers did not want USAir's employees to do anything other than what they would ordinarily do. At this point, Amigone picked-up the maroon suitcase and, accompanied by Officers Niczyporowicz, Gerace and Terranova, carried it into the nearby baggage service office. After examining its exterior and finding no identification, Amigone opened the suitcase and saw a large brown paper bag which was folded closed. Further inspection revealed that within the paper bag was a plastic bag containing white powder. Amigone then looked in a side pocket of the suitcase and found two letters addressed to Michael Lee. Officer Niczyporowicz, after informing Amigone that he believed the white powder was cocaine, took possession of the suitcase and placed Lee under arrest. Subsequently, the white powder was determined to be cocaine.

In district court, Lee moved to suppress the cocaine, arguing that the search of his maroon suitcase violated his fourth amendment rights. After a suppression hearing, District Judge Elfvin found that Lee had abandoned his suitcase and therefore had no basis to assert a fourth amendment violation. *See United States v. Lee*, CR-88–5E at 7, 1988 WL 118480 (W.D.N.Y. Nov. 3, 1988). Further, the court determined that the events leading to Lee's abandonment of the suitcase did not themselves constitute an infringement on his constitutional rights. *See id.* Thus, the district court denied the motion. Lee subsequently entered a conditional plea of guilty, reserving his right to appeal the denial of his suppression motion.

## DISCUSSION

### 1. Abandonment of the Suitcase

■ The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." When a person voluntarily abandons property, however, he forfeits any reasonable expectation of privacy that he might have had in the property. *See United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir.1987); *see also United States v. Thomas*, 864 F.2d 843, 845 (D.C.Cir.1989). The fourth amendment's protections, therefore, do not extend to abandoned property. *See United States v. Moskowitz*, 883 F.2d 1142, 1147 (2d Cir.1989); *see also Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960).

■ In determining whether there has been an abandonment, the district court must focus on the intent of the person who is purported to have abandoned the property. *Moskowitz*, 883 F.2d at 1147; *United States v. Cowan*, 396 F.2d 83, 87 (2d Cir. 1968). "[I]ntent may be inferred from words spoken, acts done, and other objective facts." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973); *see Cowan*, 396 F.2d at 87. Since this inquiry is necessarily factual, we will uphold the district court's finding unless clearly erroneous. *Moskowitz*, 883 F.2d at 1147.

■ Conceding that his statements to the law enforcement officers might suggest an abandonment, Lee nevertheless argues that his disclaimers should not be permitted to undermine his expectation of privacy in the suitcase. Lee stresses that his failure to immediately claim the suitcase cannot constitute an abandonment because he believed that an unclaimed suitcase left with USAir would remain safe and undisturbed. This argument misconceives the nature of the fourth amendment abandonment doctrine.

■ Although several cases indicate that the failure to promptly claim luggage checked with an airline does not itself constitute an abandonment, *see United States v. Oswald*, 783 F.2d 663, 667 (6th Cir.1986);

*United States v. Sanders*, 719 F.2d 882, 885–86 (6th Cir.1983); *cf. United States v. Most*, 876 F.2d 191, 198–99 (D.C.Cir.1989), these cases are inapposite to the circumstances presented here. When checked luggage is left for a short period in the custody of an airline, it is presumed that the luggage is stored in a secure area and is safeguarded against intrusion. *See Oswald*, 783 F.2d at 667; *cf. Most*, 876 F.2d at 199. Thus, the luggage owner's expectation of privacy remains undiminished, even though he fails to promptly retrieve his bag. However, this presumption can certainly be overcome when other objective facts demonstrate the owner's intention to abandon his property.

In the present case, the fact that Lee's suitcase remained in the safekeeping of USAir is of little relevance. In three separate instances, Lee explicitly stated that he was traveling without luggage. When informed that a maroon suitcase was sitting unclaimed in the baggage area, Lee adamantly denied it was his. Based on these unequivocal disclaimers, the district court properly found that Lee intended to abandon his suitcase and thereby forfeited any legitimate expectation of privacy in it. *See Moskowitz*, 883 F.2d at 1147; *United States v. Brady*, 842 F.2d 1313, 1316 (D.C. Cir.1988); *United States v. Tolbert*, 692 F.2d 1041, 1044–45 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). Accordingly, Lee is without any recourse under the fourth amendment to challenge the search of his suitcase.

### 2. The Encounter Between the Officers and Lee

Lee next complains that his encounter with law enforcement officers at the Buffalo airport amounted to an unjustified seizure in violation of the fourth amendment. Since Lee's statements demonstrating his intention to abandon the suitcase were a product of this encounter, Lee argues that the abandonment—and the resulting discovery of the cocaine—were tainted by a violation of his fourth amendment rights.

Therefore, Lee claims that suppression of the cocaine is required. We disagree.

■ Not every encounter between a police officer and an individual is a seizure implicating the fourth amendment's protections. *See INS v. Delgado,* 466 U.S. 210, 215–16, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Certainly, a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion of White, *J.*); *United States v. Barrios–Moriera,* 872 F.2d 12, 15 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989). Rather, an individual can be said to have been seized by the police " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, *J.*)). Essentially, this inquiry is an objective assessment of the overall coercive effect of the police conduct. *See id.* at 573–74, 100 S.Ct. at 1886–87. Factors which might suggest a seizure therefore include: the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, *J.*); *United States v. Moreno,* 897 F.2d 26, 30 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990); *United States v. Tavolacci,* 895 F.2d 1423, 1425–26 (D.C.Cir.1990); *United States v. Ceballos,* 812 F.2d 42, 47–48 (2d Cir.1987); *see also Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion of White, *J.*).

■ In the present case, the encounter with Lee took place in a public area. Although four officers were present, only two approached and questioned Lee. The officers were not in uniform and displayed no weapons. There was no show of force or physical touching. Lee's freedom was not in any way limited, nor was his movement impeded. The officers' conversation with Lee was neither threatening nor offensive. Even Officer Niczyporowicz's suggestion that the interview be conducted in the terminal—instead of at the exit—was accomplished in a non-confrontational manner. Moreover, it is evident that this request was motivated by a desire to move out of the flow of pedestrian traffic and in no way suggested that Lee was being detained. Further, after examining Lee's airplane tickets and driver's license, the officers promptly returned them to him.

The only factor that might arguably be construed as an indication that Lee was not free to leave was Officer Niczyporowicz's statement that Lee was suspected of carrying contraband. However, we are unconvinced that this single statement transformed an otherwise consensual encounter into a fourth amendment seizure. *See United States v. Winston,* 892 F.2d 112, 117 (D.C.Cir.1989); *United States v. Notorianni,* 729 F.2d 520, 522–23 (7th Cir.1984). Viewing the statement in context, it is clear that the officer—in response to Lee's own inquiry—was merely verbalizing something that was already quite obvious from the circumstances. Indeed, continued questioning of Lee, without any further explanation, would certainly have been more menacing than the candid reply that the officer provided. *See Notorianni,* 729 F.2d at 522–23. In sum, we do not believe that the officers' conduct was unduly coercive or that the encounter amounted to a seizure under the fourth amendment.

■ Nevertheless, even if we were to assume that the encounter was a seizure, we have no doubt that the officers' actions fell well within the realm of permissible conduct under the fourth amendment. A law enforcement officer is permitted to "stop and briefly detain a person for inves-

tigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884). The fourth amendment, of course, requires some minimal level of justification to support making the stop, *i.e.* something more than an inchoate suspicion or a hunch. *Id.* (citing *Delgado,* 466 U.S. at 217, 104 S.Ct. at 1763; *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883).

When first observed on January 9, Lee appeared unusually nervous and anxious. He repeatedly stared at the uniformed Officer Gerace, at times craning his neck to do so. Further, at the time of his departure from Buffalo, Lee was carrying a suitcase that appeared to be virtually empty. The officers also learned that Lee was traveling to Tampa, a destination regarded as a source for drugs, and paid for his $410 ticket in forty-one $10 bills. In addition, Lee returned on January 11, only one and one-half days after his departure. Upon his return, Lee was wearing the same clothes that he had worn when he departed and carried only a brown paper shopping bag.

Lee stresses that each one of these individual facts is wholly consistent with innocent travel. This may be so. However, the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing. *See Sokolow,* 109 S.Ct. at 1586–87; *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). We believe that Lee's actions, viewed *in toto,* warranted further investigation. Indeed, numerous cases, considering facts virtually identical to those presented here, reach just such a conclusion. *See, e.g., Sokolow,* 109 S.Ct. at 1586–87; *Florida v. Rodriguez,* 469 U.S. 1, 3–4, 6, 105 S.Ct. 308, 308–09, 311, 83 L.Ed.2d 165 (1984) (per curiam); *Mendenhall,* 446 U.S. at 560–61, 563–65, 100 S.Ct. at 1880–81, 1882–83 (concurring opinion of Powell, *J.*); *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 342–43 (2d Cir.1982);

*United States v. Forero–Rincon,* 626 F.2d 218, 222–24 (2d Cir.1980). *See generally* 3 W. LaFave, *Search and Seizure* § 9.3(c), at 442–47 (2d ed. 1987 & Supp.1990). Thus, the officers were fully justified in stopping and questioning Lee.

## CONCLUSION

For the reasons set forth above, we find that the district court properly denied Lee's motion to suppress. Accordingly, the judgment of conviction is affirmed.