**UNITED STATES of America, Appellant,**

v.

**Asim SPRINGER, Defendant–Appellee.**

**No. 1288, Docket 90–1668.**

United States Court of Appeals, Second Circuit.

Argued April 12, 1991.

Decided Oct. 16, 1991.

Kathleen A. Felton, Dept. of Justice, Washington, D.C. (Dennis C. Vacco, U.S. Atty., Thomas S. Duskiewicz, Asst. U.S. Atty., W.D.N.Y., of counsel), for appellant.

Robert N. Convissar, Buffalo, N.Y. (Cohen & Lombardo, P.C., Buffalo, N.Y., of counsel), for defendant-appellee.

Before CARDAMONE and MAHONEY, Circuit Judges, and McKENNA,* District Judge.

MAHONEY, Circuit Judge:

The United States appeals from an order of the United States District Court for the Western District of New York, John T. Elfvin, *Judge*, granting the motion of defendant-appellee Asim Springer to suppress as trial evidence cocaine found in his suitcase and certain statements made by him. *See United States v. Springer*, 750 F.Supp. 79 (W.D.N.Y.1990). The district court granted the motion, concluding that the cocaine seized and the statements made were the tainted fruit of an illegal investigatory stop.

For the reasons that follow, we reverse the order of suppression.

### Background

A one-count indictment filed on February 7, 1990 charged Asim Springer with possessing with intent to distribute approximately one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1) (1988). Springer moved to suppress physical evidence of cocaine and statements he made that supported the indictment. The district court then conducted a suppression hearing directed at the issues presented on this appeal. The factual summary that follows derives from the uncontested testimony at the suppression hearing of two government agents, Bruce R. Johnson of the Drug En-

---

* The Honorable Lawrence M. McKenna, United States District Judge for the Southern District of New York, sitting by designation.

forcement Administration and Daniel F. Allman of the United States Border Patrol.

As members of a drug and drug-money interdiction team, Johnson and Allman were engaged in the surveillance of Buffalo, New York transportation centers in an attempt to curb the flow of illicit drugs into the city. As part of their training, task force members are trained in the utilization of a drug courier "profile."

Early in the morning of February 7, 1990, Johnson and Allman were stationed at the Niagara Frontier Transportation Authority ("NFTA") bus terminal in Buffalo. The task force focuses particular attention on the arrival early each morning of an express bus that leaves New York City in the late evening, believing that this bus is commonly used by drug traffickers seeking to exploit the ebb in police activity that occurs during the evening and early morning hours.

Dressed in plain clothes, Johnson and Allman observed the passengers disembark from the early morning express. The first person off the bus, unlike most passengers, walked toward the street rather than the terminal. Suspicious, Allman followed the man, ascertained that he was an illegal alien, and took him into custody.

In the meantime, Johnson, continuing to observe the passengers disembark, noticed that a man subsequently identified as Springer appeared nervous, and appeared to take a keen interest in Allman's encounter with the illegal alien. Springer carried a large blue and red shoulder bag, and retrieved a large bluish-gray suitcase from the luggage compartment of the bus.

Springer departed the terminal and remained outside for a few minutes, watching Allman escort the illegal alien into the terminal, and continued to appear nervous. He then entered the terminal. After pacing the terminal floor for a short while, Springer looked directly at Johnson and Allman, who were standing at that moment together with some uniformed officers, then turned and walked briskly out of the terminal.

Johnson followed Springer and approached him as he stood at a taxi stand outside the terminal. Johnson identified himself as a police officer, displayed his badge, and asked Springer if he could speak to him. Springer consented. Johnson then asked Springer if he would mind stepping away from the curb so as to be away from the moving traffic. Springer agreed, and the two men stepped over to a partition in front of the terminal.

Johnson asked Springer if he had any identification. Springer produced a New York City food stamp card with his name and picture on it. At that juncture, Allman joined Johnson and Springer. Johnson then asked Springer why he had come to Buffalo, and Springer responded that his purpose was to visit his cousin. Johnson asked where the cousin lived. Springer responded that he didn't know, and that he intended to go to a motel near the airport and call his cousin to come to meet him. Johnson asked Springer for the name of his cousin, and Springer stated that it was Robert Graham.

Upon hearing this, Allman inquired whether the name on a tag on the suitcase, Willy Graham, was the name of Springer's cousin. Springer responded: "no, that's— that's somebody else." Johnson then asked Springer if he had his cousin's telephone number. Springer said no, explaining that he was going to take a cab to the motel and his cousin would meet him there.

At this point, Johnson explained to Springer that he and Allman investigated drug trafficking at the terminal, and asked Springer if he would consent to a search of his luggage, also advising Springer that he was not under arrest and need not consent to the search. Springer answered, "no problem, go ahead," and handed Johnson the suitcase.

Johnson attempted to open the bag, but found it locked. He asked Springer if he could have the key. Springer exclaimed: "oh my God, that's not my suitcase. My suitcase didn't have a padlock on it." Johnson asked if the bag Springer was carrying on his shoulder belonged to him, and Springer replied that it did. Johnson then asked if Springer would mind going inside

the terminal to the NFTA police office to sort out the problem concerning the luggage, and Springer said: "fine, no problem."

The three men then went to the police office, where they told a police officer that they were going to leave the bags in the office for a few minutes while they addressed the problem of Springer's missing suitcase. The three men went to the baggage handler and had him check all the luggage remaining on the bus. Not finding Springer's bag, they went to the Greyhound customer service counter and asked whether anyone had turned in a suitcase or reported one missing. No such report had been made. They then returned to the police office. Johnson once again asked Springer if he would permit a search of the suitcase, and Springer replied: "Go ahead, it's not mine."

One of the officers then picked the lock on the suitcase, wherein Johnson found a woman's mink coat and a worn leather jacket. Inside the fur coat, Johnson found a package wrapped in cellophane and duct tape. He asked Springer what was inside the package, and Springer said: "I don't know. It's not my bag." Johnson cut a small opening in the package, found that it contained a white powder, and conducted a field test which disclosed that the substance was cocaine.

Johnson then asked Springer if he could search the shoulder bag, and Springer consented. The bag contained only men's clothes and a bed sheet. The agents then noticed that there were baggage claim stubs on both the suitcase and the shoulder bag, and further noted that the two stubs were sequentially numbered, suggesting that the bags had been checked together. Sequentially numbered claim stubs from U.S. Air were also attached to the two bags.

Johnson then asked Springer if he would try on the leather coat that had been found in the suitcase. Springer did so, and the agents observed that the coat fit him. The agents then placed Springer under arrest and advised him of his constitutional rights. In a search of Springer's person

incident to his arrest, the agents found a rolled up five dollar bill that contained a small quantity of cocaine.

Springer was then indicted for possession of approximately one kilogram of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988), and moved to suppress the cocaine that had been seized and certain statements that he had made. The district court granted Springer's motion, concluding that "[a]n illegal stop had occurred at the point when Johnson asked Springer to step away from the taxi stand and the curb," 750 F.Supp. at 80, and the cocaine and statements were the illegal fruits of that seizure. *See id.* In so ruling, the court noted Johnson's testimony that Springer had not "totally met the aspects" of the drug courier profile. *Id.*

The government appeals the district court's suppression order pursuant to 18 U.S.C. § 3731 (1988).

### Discussion

We review the district court's factual findings for clear error. *United States v. Madison,* 936 F.2d 90, 92 (2d Cir.1991); *United States v. Uribe–Velasco,* 930 F.2d 1029, 1032 (2d Cir.1991); *United States v. Montilla,* 928 F.2d 583, 588 (2d Cir.1991). We review *de novo* questions of law such as whether a seizure occurred and, if so, whether reasonable suspicion justified it. *Madison,* 936 F.2d at 92; *Uribe–Velasco,* 930 F.2d at 1032; *Montilla,* 928 F.2d at 588.

#### A. *Seizure of Springer.*

The district court held that Johnson seized Springer "at the point when Johnson asked Springer to step away from the taxi stand and the curb," 750 F.Supp. at 80, and that the seizure was not justified by reasonable suspicion. *See id.* We conclude, on the contrary, that no seizure occurred at that juncture, thus mooting the question as to reasonable suspicion.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382,

2386, 115 L.Ed.2d 389 (1991). Rather, a seizure takes place " '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *Bostick,* 111 S.Ct. at 2386 (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). Otherwise, an encounter between a police officer and a citizen is consensual, and implicates no Fourth Amendment interest. *See Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984).

As the Court made clear in *Bostick:*
[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, see *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Rodriguez, supra,* 469 U.S., at 5–6, 105 S.Ct., at 310–311; ask to examine the individual's identification, see *Delgado, supra,* 466 U.S., at 216, 104 S.Ct. at 1762; [*Florida v.*]*Royer, supra,* 460 U.S. [491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)] (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 557–558, 100 S.Ct. 1870, 1878–1879, 64 L.Ed.2d 497 (1980); and request consent to search his or her luggage, see *Royer, supra,* 460 U.S., at 501, 103 S.Ct., at 1326 (plurality opinion)—as long as the police do not convey a message that compliance with their requests is required.
111 S.Ct. at 2386.

The Court rearticulated in *Bostick* the appropriate inquiry to determine whether a seizure has occurred, as follows:
We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.
111 S.Ct. at 2389.

The test calls for a "contextual approach," *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), that takes into account " ' "all the circumstances surrounding the incident" ' in each individual case." *Id.* at 572, 108 S.Ct. at 1979 (quoting *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.))). It is also an "objective standard—looking to the reasonable man's interpretation of the conduct in question." *Id.* at 574, 108 S.Ct. at 1980. Further, this " 'reasonable person' test presupposes an *innocent* person." *Bostick,* 111 S.Ct. at 2388 (citing *Florida v. Royer,* 460 U.S. 491, 519 n. 4, 103 S.Ct. 1319, 1335 n. 4, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting)).

As an aid in applying the test, we have identified some factors that might suggest that a seizure has occurred:
"the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room."
*United States v. Hooper,* 935 F.2d 484, 491 (2d Cir.1991) (quoting *United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990)); *see also Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.). There is no requirement that an officer affirmatively advise an interviewee that he is free to leave or terminate the interview. *See Hooper,* 935 F.2d at 492; *Montilla,* 928 F.2d at 589.

In light of the applicable law, we conclude that no seizure occurred when Johnson asked Springer to step away from the taxi stand and the curb. Only a single officer, Johnson, initially approached. He was in plain clothes and displayed no weapon. He made no show of force, and did not physically touch Springer. Johnson's conversation with Springer was neither intimidating nor coercive. Further, the record makes plain that Johnson's suggestion that

Springer move from the curb was prompted by a desire to secure a safe and convenient place to talk, not to imply coercion or confinement. *See Hooper*, 935 F.2d at 487, 492 (no seizure occurred when defendant was requested to move to less congested area); *Lee*, 916 F.2d at 819 (same).

■ The analysis of the district court did not go beyond the initial encounter between Johnson and Springer, in view of the court's determination that the encounter was an illegal seizure. Ours need not proceed much further. Springer's "confused and contradictory responses" during the initial interview with Johnson and Allman, *see Hooper*, 935 F.2d at 494, together with his implausible claim that the suitcase did not belong to him, *cf. Madison*, 936 F.2d at 92, provided reasonable suspicion to detain him by the time that interview was concluded. Thus, even assuming that some nonconsensual detention occurred subsequent to the initial interview but prior to Springer's arrest, it would have been warranted under the circumstances.

B. *Abandonment of the Suitcase.*

■ The district court similarly did not reach the issue whether Springer abandoned the suitcase in which the cocaine was found, in view of its determination that the illegality of the initial seizure tainted all the evidence that resulted from the encounter at the bus terminal. *See* 750 F.Supp. at 80. Since we reverse that determination, however, we address the question of abandonment.

It is settled that a warrantless seizure of property that has been abandoned does not violate the Fourth Amendment. *See Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Lee*, 916 F.2d 814, 818 (2d Cir.1990). Further, the uncontested testimony at the suppression hearing was that Springer consistently disclaimed any ownership of the suitcase from the time that he initially declared that it was not his bag. Accordingly, the agents' seizure and subsequent search of the suitcase did not violate the Fourth Amendment. *See Madison*, 936 F.2d at 96; *United States v. Lewis*, 921

F.2d 1294, 1301–03 (D.C.Cir.1990); *Lee*, 916 F.2d at 818.

### Conclusion

The order of the district court suppressing the cocaine seized at the bus terminal and Springer's statements on that occasion is reversed.