**UNITED STATES of America**

v.

**Philip A. GIORDANO**

**No. 3:01CR216 (AHN).**

United States District Court, D. Connecticut.

Feb. 14, 2003.

Peter S. Jongbloed, John A. Danaher, III, John A. Marrella, U.S. Attorney's Office, New Haven, CT, for U.S.

Andrew B. Bowman, Law Offices of Andrew Bowman, Westport, CT, for Defendant.

*RULING ON DEFENDANT'S MOTION TO SUPPRESS TITLE III ELECTRONIC SURVEILLANCE INTERCEPTS AND ALL EVIDENCE DERIVED THEREFROM; AND MOTION TO SUPPRESS ORAL STATEMENTS AND ALL EVIDENCE AND TANGIBLE OBJECTS DERIVED THEREFROM*

NEVAS, District Judge.

Defendant Philip A. Giordano ("Giordano") moves to suppress the following two bodies of evidence: (1) the government's electronic surveillance that intercepted telephone conversations between him and Guitana Jones, a prostitute with whom he had a long-standing relationship, and all evidence derived from those wiretaps; and (2) the oral statements he made to federal agents between July 23–26, 2001, and all evidence derived therefrom. For the reasons discussed below, both motions [docs. ## 100, 103] are DENIED.

## BACKGROUND

I. *The Waterbury Political Corruption Investigation and the Evidence of Sexual Abuse Involving Minors*

This case arose from a municipal political corruption investigation involving the City of Waterbury, Connecticut in which the Federal Bureau of Investigation ("FBI") focused on the activities of Giordano, the Mayor of Waterbury; Joseph Pontoriero ("Pontoriero"), the owner of Worth Construction and reputed member of the Genovese crime family; and their close aides and associates.

Beginning in February 18, 2001, the FBI filed the first of seven applications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2520 (1982). In those applications, the FBI sought court authorization to intercept the wire and oral communications of Giordano, Pontoriero, and others believed to be involved in municipal corruption and racketeering activities. The FBI detailed its factual basis for those applications in affidavits submitted by FBI Special Agent William S. Reiner, Jr. ("Agent Reiner"). The court granted each of those applications.

On July 13, 2001, the government submitted to the court a report entitled, "Filing Regarding Possible Sex Offense." In a subsequent filing dated July 18, 2001, entitled "Second Filing Regarding Possible

Sex Offenses," the government advised of additional intercepted communications that involved Giordano having sexual conduct with minors, including a conversation that occurred at approximately 3:15 p.m. on July 13, 2001, between Giordano and Guitana Jones ("Jones"), a known prostitute who had a long-standing history with Giordano. Based on these communications, Agent Reiner concluded that there was probable cause to believe that Giordano had engaged in sexual relations with at least one minor child.

On July 20, 2001, the government filed an application for electronic surveillance under § 2517 of Title III regarding the interception of the communications involving the sexual misconduct with minors. On the same date, the court issued an order granting the application and issued a criminal complaint charging Jones with conspiring to violate and violating 18 U.S.C. §§ 2425 and 371. The FBI arrested Jones on July 21, 2001. She agreed to cooperate with the FBI and assisted in gathering additional evidence against Giordano.

## II. The Superceding Indictment

Thereafter, the grand jury returned an eighteen-count superceding indictment charging Giordano with, among other things, (1) depriving two minor children of their due process liberty rights to be free from sexual abuse in violation of 18 U.S.C. § 242; (2) conspiring to knowingly initiate the transmission of the minor victims' names by using facilities and means of interstate and foreign commerce in violation of 18 U.S.C. §§ 2425 and 371; and (3) knowingly initiating the transmission of the minor victims' names by using facilities and means of interstate and foreign commerce with the intent to entice, encourage, offer, and solicit them to engage in sexual activity in violation of 18 U.S.C. § 2425. The State of Connecticut also charged him separately with first-degree sexual assault, risk of injury to a minor, and conspiracy.

## III. The Suppression Hearing

On January 6 and 9, 2003, the court heard oral argument on Giordano's motions to suppress and held an evidentiary hearing on the motion to suppress the oral statements.[1] Giordano filed an affidavit claiming that he had been arrested on the morning of July 23, 2001, and that his presentment before a magistrate was unreasonably delayed until July 26, 2001. He also asserted that all oral or written statements or consents given by him during this time were involuntary. The court also heard testimony from FBI Special Agent–in–Charge Michael Clarke and Agents Reiner, Peter Lavelle, Joseph McTague, and Mark Gentil. The evidentiary hearing, which shall be discussed at greater length infra, disclosed the following relevant facts:

As part of the investigation, FBI agents had Jones arrange to meet Giordano at a commuter parking lot on July 23, 2001. To induce Giordano to attend this meeting, a government agent posing as an associate of Jones demanded a $500 cash payment from Giordano. Giordano was told that if he did not provide the money, Jones's purported associate would publicly disclose Giordano's sexual activities with minors.

1. On January 6, 2003, the court also denied Giordano's motion for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to challenge whether there was probable cause to support the Title III wiretaps. In so ruling, the court found that Giordano had failed to make a "substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the [officer] in the warrant affidavit." *Id.*

Giordano arrived at the commuter parking lot on July 23, 2001, as planned. After Giordano gave the money to the agent posing as Jones's associate, Agent Reiner approached Giordano, identified himself as an FBI agent, and informed him that the FBI had evidence of his sexual misconduct and his corrupt activities as Mayor of Waterbury. The agents at the lot did not display their weapons. Giordano voluntarily exited his vehicle and was hurried into an unmarked FBI car in order to prevent passers-by from noticing him. After Giordano got into the car, Agent Reiner told him that he was not under arrest, and that it would be in his best interest to cooperate in the corruption investigation, which Agent Reiner referred to as "the biggest decision in [Giordano's] life." Agent Reiner repeated several times that Giordano was not under arrest. After a brief period of reflection, Giordano agreed to cooperate and to accompany the agents to the FBI office in New Haven. For his safety and with his permission, the agents handcuffed Giordano's hands in front of his body. The handcuffs were removed after he arrived in New Haven, and he was never again placed in handcuffs until his arrest three days later.

From that time until the morning of July 26, 2001, Giordano actively participated in the FBI's corruption investigation. Agent Reiner testified that Giordano was an excellent cooperating witness and seemed to enjoy assisting with the investigation. During his cooperation, Giordano spoke freely and made several inculpatory statements, including with respect to his sexual misconduct. Giordano also concocted different explanations for his absence from Waterbury that he related to his wife and business associates.

At the government's request, Giordano conducted telephone conversations and face-to-face meetings with targets of the FBI investigation, including Pontoriero and Claudio Mancini. Giordano allowed the government to install a recording device on his cellular telephone, and to place a transmitter and recording device on his person so that the FBI could monitor these conversations and meetings. In addition, when his family was not present, Giordano accompanied FBI agents to retrieve from his home two business suits and $5,250 in cash, which he claimed were given to him by Pontoriero. Giordano signed written statements giving his consent to the above actions.

The hearing further disclosed that while Giordano was cooperating, he was frequently in the presence of federal agents and subject to FBI surveillance, particularly when he was in public. The planning sessions for his cooperation were held primarily at the FBI office in New Haven. In the evenings, federal agents stayed with him at a hotel suite in New Haven. The agents testified that they were concerned for Giordano's safety out of fear that the targets of the corruption investigation could retaliate against him if they found out he had become a cooperating witness. In fact, on the one occasion that Giordano went home to see his family, he specifically requested that a federal agent accompany him.

Nevertheless, during that three-day period, Giordano was afforded a significant degree of personal autonomy. He was allowed to drive by himself in his own car to meet Pontoriero and his son Michael. On July 25, 2001, he drove by himself from New Haven to Waterbury to attend a city meeting in his official capacity as mayor. He met his wife and children on two separate occasions, once in a Waterbury restaurant and once at home. He made more than 100 phone calls on his cellular telephone. Agents also did not accompany him to the bathroom.

On July 25, 2001, Giordano gave a signed, handwritten statement in which he

stated that he did not consider himself to be under arrest; that he had been voluntarily staying with federal agents in order to prevent public knowledge of his cooperation; that his actions since July 23, 2001, had been completely voluntary and were done to further the FBI investigation; that he was able to use his cellular phone and had opportunities to contact his family and office; that FBI agents had been with him solely for his protection; and that his cooperation with the FBI was motivated by a desire not only to further the investigation, but also to gain favorable consideration for the crimes of which he was now accused. Agent Reiner provided Giordano with a sample document to prepare this statement, which Giordano significantly modified on his own accord.

There was also testimony at the hearing that before becoming Mayor of Waterbury, Giordano was an attorney whose practice included criminal law. He also took criminal law and criminal procedure classes in law school.

At 7:45 a.m. on July 26, 2001, the FBI arrested Giordano without a warrant at the FBI's office in New Haven. Around that time, Giordano spoke with his wife by telephone and told her that he still had not been arrested. Giordano met with defense counsel from approximately 9:07 a.m. to 9:36 a.m. The government issued a criminal complaint charging him with conspiring to violate and violating 18 U.S.C. §§ 2425 and 371. Giordano was transported to the court, where he appeared that morning at approximately 10:21 a.m.

On the same date, based in part on the information Giordano had provided, the FBI executed several search warrants in and around Waterbury.

## DISCUSSION

The court makes the following findings of fact and conclusions of law.

I. *Motion to Suppress Title III Electronic Surveillance Intercepts and All Evidence Derived Therefrom*

Giordano's Title III suppression motion raises three questions: (1) whether the government had probable cause under the totality of the circumstances to conduct surveillance of the wire communications between Giordano and Jones; (2) whether the government was entitled to intercept the conversations between Giordano and Jones involving his sexual relations with minors, even though the offenses pertaining to his sexual misconduct were not specifically enumerated in the wiretapping statute; and (3) assuming that the interception of these communications was invalid, whether the government properly minimized these conversations under Title III.

Giordano presents three arguments. As to the first issue, he contends that the government was not authorized to intercept the communications at issue because those communications involved violations of 18 U.S.C. § 242 (deprivation of civil rights under color of law) and § 2425 (use of an interstate facility to transmit information about a minor), neither of which is an authorized crime for wire interception under 18 U.S.C. § 2516. Moreover, in his view, the government acted in bad faith and deliberately withheld information from the court that it was intercepting these communications. Finally, he asserts that the government failed to minimize these communications. None of these arguments has merit.

A. *The Government Had Probable Cause to Intercept the Telephone Communications Between Giordano and Jones*

From February 18 to July 20, 2001, the court issued seven orders authorizing

the government to conduct electronic surveillance of the cellular phones belonging to Giordano and several business associates. Under Title III, the district court was required to make the following findings before issuing an order authorizing the interception of electronic communications:

> (1) there existed probable cause to believe that an individual is committing, has committed, or will commit one of a list of specified crimes, 18 U.S.C. § 2518(3)(a);
>
> (2) there existed probable cause that communications concerning that offense will be obtained through the interception, 18 U.S.C. § 2518(3)(b);
>
> (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or be too dangerous if tried, 18 U.S.C. § 2518(3)(c); and
>
> (4) there existed probable cause that the facilities from which, or place where, the communications are to be intercepted are being used in connection with the commission of the offense, 18 U.S.C. § 2518(3)(d).

The affidavits prepared by Agent Reiner in support of the Title III applications plainly gave the court a sufficient basis for concluding that evidence of criminal conduct would be intercepted over Giordano's cellular phones. These affidavits specifically described how Giordano was using his position as Mayor of Waterbury to improperly influence, among other things, the award of city contracts to Worth Construction or other companies controlled by Pontoriero. These contracts included the privatization of Waterbury's landfill and wastewater treatment facility, the construction of a new dog pound without soliciting other bids, and the construction of a landfill in the north end of Waterbury. In return for giving Pontoriero preferential treatment, Giordano enjoyed numerous benefits from him, such as cash payments, trips to Italy and the Super Bowl, and contributions to his 2000 U.S. Senate campaign. Based on these facts, the court had a substantial basis to find probable cause to authorize the government to intercept wire communications over the two cellular phones that Giordano was using at the time.

Further, conversations such as those between Giordano and individuals such as Jones were directly relevant to the government's corruption investigation. The investigation sought evidence substantiating the government's belief that Giordano was receiving money from sources other than his modest income as Mayor of Waterbury. Consequently, any evidence revealing that Giordano was receiving bribes and then disbursing the money to a network of prostitutes, such as Jones, would tend to show that he was abusing his public office for improper and illegal gain. Therefore, the court had probable cause to authorize the government's surveillance of telephone conversations between Giordano and Jones.

B. *The Interception of the Giordano–Jones Communications Was Consistent with Title III and Was Done in Good Faith*

█ Giordano correctly observes that violations of 18 U.S.C. § 242 (deprivation of civil rights under color of law) or § 2425 (use of an interstate facility to transmit information about a minor) are not named in 18 U.S.C. § 2516 of Title III as authorized offenses for which the government may conduct wiretaps. But this fact alone is not dispositive. Where, as here, the government has a legitimate basis for intercepting the wire communications, Title III allows law enforcement officials to hear

conversations relating to crimes not authorized in the statute.

More specifically, § 2517(5) of Title III allows the government to use evidence of crimes not enumerated in § 2516, often referred to as "other crimes," when that evidence is obtained during the course of an investigation for an authorized offense. The Second Circuit has explicitly upheld this practice: "[S]hould the law enforcement officer, in the course of conducting the authorized interception, come across communications relating to offenses other than those specified in the order of authorization or approval, he must obtain the authorization or approval of a court of competent jurisdiction as soon as practicable before the communications might be used in connection with the unspecified offense." *United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir.1977). The Second Circuit has further found "Congress intended that judicial approval of the interception of evidence relating to nonauthorized offense might retroactively be granted pursuant to § 2517(5) upon a showing that the original order was lawfully obtained, that it [was] sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *Id.* at 1068.

In the instant case, the government fully complied with the procedures set forth in § 2517(5) and *Masciarelli*. On July 13, 2001, the government submitted to the court a report entitled "Filing Regarding Possible Sex Offenses." On the same date, at approximately 3:15 p.m., the government unexpectedly intercepted a conversation between Giordano and Jones in which they were apparently making arrangements for Giordano to have sexual relations with a minor. On July 18, 2001, the government filed a second report, entitled "Second Filing Regarding Possible Sex Offenses." On July 20, 2001, it filed the application for a § 2517(5) order. In these filings, the government provided additional information to the court concerning the occurrence and content of the communications between Giordano and Jones, requested authorization to use the intercepted communications as evidence, and asked for permission to disclose the evidence to state authorities. On July 20, 2001, the court granted the application for the § 2517(5) order. These actions demonstrate that the government properly kept the court apprised of the unanticipated interception of communications between Giordano and Jones, and refute Giordano's allegation that the government concealed the sexual nature of these conversations. Therefore, because the government complied with the requirements of § 2517(5) and *Masciarelli*, Giordano's allegation that the government acted in bad faith in conducting the wiretaps is baseless.

Moreover, the government's interception of the communications between Giordano and Jones was consistent with the plain view doctrine under the Fourth Amendment as applied to Title III electronic surveillance. The Second Circuit has noted that when "a law enforcement officer lawfully engage[d] in a search for evidence of one crime inadvertently comes upon evidence of another crime[,] the public interest militates against his being required to ignore what is in plain view." *Masciarelli*, 558 F.2d at 1067. For the plain view doctrine to apply, a law enforcement officer must lawfully make an initial intrusion into an area from which he can view a particular area and discover the incriminating evidence inadvertently. In addition, it must be immediately apparent to the officer that the item observed in plain view may be evidence of a crime or

contraband. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–70, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

In this case, the government has satisfied all of the requirements of the plain view doctrine with respect to the interception of the Giordano–Jones communications. First, based on the government's applications and Agent Reiner's affidavits, the court had already authorized the lawful interception of Giordano's wire communications for the corruption investigation. Second, the intercepted communications regarding Giordano's sexual misconduct were unanticipated and their discovery was incidental to the goals of the investigation. Third, based on the content of the intercepted conversations, it was immediately apparent to the FBI agents that Giordano and Jones were using interstate facilities to arrange for illegal sexual liaisons between Giordano and minors. Consequently, the government was under no legal obligation to ignore the unanticipated evidence of Giordano's sexual misconduct that was found in plain view. In the words of the D.C. Circuit, "officers attending a properly authorized, limited, and supervised wiretap *have no obligation to close their ears to unexpected incriminating information or matter unrelated to their immediate investigation* .... Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence." *United States v. Johnson,* 539 F.2d 181, 188 (D.C.Cir.1976) (emphasis added), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977).

C. *Even Assuming That the Title III Surveillance Was Not Authorized, the Government Properly Minimized Its Interception of the Giordano–Jones Communications*

 Finally, even assuming that the Title III surveillance was not properly au-

thorized, there is no merit to Giordano's claim that the government failed to minimize his conversations with Jones. The government intercepted 151 calls between Giordano and Jones or in which Giordano made reference to Jones. Of those 151 calls, 149 were less than two minutes in duration. Jones was not a party to either of the two calls which lasted longer than two minutes. The Second Circuit has held that calls lasting less than two minutes need not be minimized. *See United States v. Capra,* 501 F.2d 267, 275–76 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) (two minutes is "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation"). Thus, because all calls between Giordano and Jones were less than two minutes in length, the government was not required to minimize them.

Accordingly, for the reasons discussed above, the court denies the motion to suppress the electronic surveillance intercepted pursuant to Title III and all evidence derived therefrom.

II. *Motion to Suppress Oral Statements Made by Giordano Between July 23–26, 2001, and Physical Evidence Derived Therefrom*

The motion to suppress Giordano's oral statements and all related physical evidence hinges on whether Giordano was in custody between July 23 and the morning of July 26, 2001. Giordano claims that he was under arrest from the moment federal agents approached him in the commuter parking lot on July 23, 2001, and was denied his right to be presented before a magistrate "without unnecessary delay" as required by Fed.R.Crim.P. 5. Based on the evidence adduced at the suppression hear-

ing, however, the court finds that Giordano was voluntarily cooperating with law enforcement officials during this time period, and was not being held in police custody involuntarily or against his will. Consequently, all statements made by him between July 23–26, 2001, were voluntary. Furthermore, even assuming that Giordano was in custody, the court finds that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights against self-incrimination.

A. *Giordano Was Not Seized or Taken Into Custody Until the Morning of July 26, 2001*

A seizure of a person does not occur unless "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Second Circuit has identified the following non-inclusive factors which may indicate whether a seizure has occurred: (1) the threatening presence of several officers; (2) the display of a weapon; (3) the officer's physical touching of the person; (4) spoken statements by the officer that indicate in tone or substance that compliance is compulsory; (5) prolonged retention of a person's personal effects; and (6) an officer's request that the subject accompany him to the police station. *United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990).

Further, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the Fifth Amendment prohibits the admission of statements given by a suspect during a "custodial interrogation" without a prior warning. A suspect is entitled to receive *Miranda* warnings only "after [he] has been taken into custody or otherwise deprived of his freedom of action

in [a] significant way." *Id.* at 444, 86 S.Ct. 1602. The Second Circuit has framed the issue as "whether a reasonable person in the same situation would have believed that he was not free to leave." *United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir.1990) (citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). In determining whether a person is in custody, a court asks two questions: (1) what were the circumstances surrounding the interrogation; and (2) under those circumstances, would a reasonable person have felt at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The court may find that a suspect waived his *Miranda* rights if the "totality of the circumstances surrounding the interrogation" shows that the suspect made an uncoerced choice and had the necessary level of comprehension. *Id.* at 465.

The testimony and the exhibits introduced at the suppression hearing wholly undermine Giordano's argument that his participation in the FBI investigation between July 23–26, 2001, was coerced and involuntary. To the contrary, it demonstrates that his conduct was a voluntary effort to cooperate with the government. The most telling piece of evidence is Giordano's signed, handwritten statement of July 25, 2001. In that statement, Giordano makes clear that he did not consider himself to be in custody, and leaves little doubt that he, on his own volition, chose to cooperate with the government:

I Philip A. Giordano was advised on July 23, 2001 by Special Agents Reiner, McTague and Lavelle that *I was not under arrest* and was asked if *I would voluntarily accompany them to the FBI so I could assist them in an investigation. I voluntarily stayed with the agents* so as not to risk word getting

[out] of my cooperation thus hindering the investigation. *I did not nor do I believe that any time that I was under arrest and that my actions since the above stated date have been completely voluntary and in the spirit of cooperation.*

Gov. Exh. 12 (emphasis added). Given Giordano's status as an attorney who practiced criminal law, he has no basis for claiming that he did not understand the significance of what he wrote.

In this statement, Giordano further acknowledges that he was able to use his cellular phone and had opportunities to contact his family and office, and that FBI agents had been with him "solely for [his] protection." *Id.* He also states that he was motivated "to be completely cooperative [with the FBI investigation] in order to further the investigation, and also to try to cast [himself] in the most favorable light possible." *Id.* Thus, it is apparent that Giordano was cooperating with the corruption investigation in order to further his own self-interest.

Giordano's handwritten statement comports with Agent Reiner's testimony that Giordano was neither seized nor arrested when Reiner approached him in the commuter parking lot on July 23, 2001. In that encounter, federal agents did not brandish their weapons, nor did they physically force Giordano into their unmarked vehicle. Although Giordano was initially handcuffed, the agents did so in the front of his body and only with his consent. The FBI handcuffed him to ensure that he did not attempt to harm himself immediately after being confronted with the evidence of his sexual abuse of minors. The handcuffs were removed when Giordano arrived in the New Haven FBI office and remained off until he was arrested on July 26, 2001.

In addition, Agent Reiner informed Giordano several times that he was not under arrest. Like the other agents, Agent Reiner testified that Giordano was free to leave, and explained that the FBI was seeking his cooperation in its corruption investigation. Giordano voluntarily agreed to cooperate and asked Agent Reiner when he would be arrested. Reiner responded that he did not know when that would occur. Indeed, on the morning of July 26, 2001, nearly three days after he had agreed to cooperate, Giordano told his wife on the telephone that he had not been arrested. Based on the totality of the evidence, it is apparent that Giordano did not believe he was under arrest until 7:45 a.m. on July 26, 2001.

Next, Giordano's extensive involvement in his cooperation with the FBI further demonstrates that he was not under arrest or in government custody. For example, after conferring with the agents, Giordano had telephone conversations and set up face-to-face meetings with targets of the corruption investigation. In fact, on July 23, 2001, the first day of his cooperation, Giordano executed a written consent permitting federal agents to install a device on his cellular telephone to record his conversations with Pontoriero and others. According to the consent form that Giordano signed, his consent was given "without threats or promises of any kind." Gov. Exh. 7. Giordano also allowed FBI and IRS agents to place a body recorder and transmitter on his person to record his conversations with Joseph and Michael Pontoriero. His voluntary consent was in writing and unequivocal: "I have given this written permission to the above-named Special Agents voluntarily and without threats or promises of any kind . . . ." Gov. Exh. 8. Once again, Giordano's status as an attorney precludes him from contending that he did not understand what he was doing or what these documents meant.

Moreover, on July 23, 2001, Giordano gave government agents written consent to search his home to recover two business suits and $5,250 in cash given to him by Pontoriero. In that document, Giordano clearly states: "I Philip A. Giordano give consent to SAs William S. Reiner Jr. and Joe McTague to search my house which is located at 157 Southwind Road, Waterbury, CT. I have been advised of the rights I have regarding the search and voluntarily and freely consent." Gov. Exh. 11. When Giordano accompanied the agents to his home to execute the consent search, he personally retrieved these items.

Finally, the record is replete with other facts corroborating that Giordano was not under arrest, but was voluntarily cooperating with government agents to further his own self-interest. First, Giordano freely used his cellular telephone to call his family and office, to check his voice mail, and to arrange for meetings with targets of the government's investigation such as Pontoriero. Although the government was monitoring those conversations, Giordano made more than 100 phone calls during his three days of cooperation. Second, Giordano was allowed to meet in person with his wife and/or children on two separate occasions, once at home and once in a restaurant. Federal agents were nearby at both times to ensure his and his family's safety; when he visited his home, Giordano actually requested that an agent accompany him. Third, each agent who testified at the suppression hearing indicated that Giordano was not under arrest and was free to leave at any time if he chose not to cooperate. At no time did Giordano attempt to leave or request that the agents leave him alone. In fact, he had ample opportunities to leave if he were sincerely interested in ending his cooperation. For example, he drove himself in his car and attended an official city meeting in Waterbury without the presence of agents.

When Giordano met with Joseph and Michael Pontoriero at the commuter parking lot, he also drove by himself without the company of agents.

In sum, the court finds that Giordano cooperated in the government's investigation until the morning of July 26, 2001, when he was arrested without a warrant. After his arrest, he met with defense counsel for approximately 30 minutes before being presented before the court. Thus, because Giordano was not under arrest from the time he voluntarily entered the FBI vehicle at the commuter parking lot on July 23, 2001, to the time he was arrested at approximately 7:45 a.m. on July 26, 2001, there is no merit to his contention that the government violated Fed. R.Crim.P. 5 by unreasonably delaying his presentment.

B. *Even Assuming That Giordano's Statements to Federal Agents Were the Product of a Custodial Interrogation, the Record Discloses That He Voluntarily. Knowingly, and Intelligently Waived His Fifth Amendment Rights*

Finally, even if the court were to assume that Giordano was in custody from the moment federal agents approached him in the commuter lot on July 23, 2001, the facts still indicate that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights. In *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court set forth two requirements for a valid waiver of Fifth Amendment rights: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have been made with a full awareness of both the nature of the right being aban-

doned and the consequences of the decision to abandon it."

**** Voluntariness is determined by examining the totality of the circumstances and whether "the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987) (internal quotations omitted). In making this determination, the court considers factors such as (1) the type and length of questioning; (2) the defendant's age, intelligence, and education; (3) the government's method of interrogation, including whether the defendant was subjected to physical punishment; and (4) whether the defendant was advised of his constitutional rights. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The conscious decision of a person to cooperate with law enforcement is an important factor in determining whether a statement is voluntary. *See Guarno*, 819 F.2d at 31.

Based on the facts drawn from the suppression hearing, it is difficult to fathom how Giordano, an attorney who practiced criminal law and was a mayor who worked with his city's police department, was not aware of his right against self-incrimination. In the court's view, the record from the suppression hearing depicts him as a voluntary and willing cooperating witness who made a calculated decision to assist the government to gain future consideration for the serious charges he was facing. He was never questioned in a hostile environment or subjected to rigorous interrogation. Most tellingly, at no point did Giordano ever exercise his right to counsel and simply ask for a lawyer. Consequently, any incriminating statements that he made between July 23–26, 2001, were voluntarily given in order to further his own interests.

Moreover, the fact that the government gave Giordano *Miranda* warnings twice out of an abundance of caution, once orally and once in writing, eliminates any doubt that his statements were voluntary, and further assures the court that Giordano knowingly and intelligently waived his Fifth Amendment rights. On July 23, 2001, Agent Reiner orally gave Giordano *Miranda* warnings while he was in the car in the commuter lot. Later that afternoon, Reiner gave Giordano *Miranda* warnings in written form while he was in the FBI office. At that time, Giordano signed a written waiver that stated in pertinent part:

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

. . . . .

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

. . . . .

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Gov. Exh. 6. It strains credulity to believe that Giordano, as an attorney who practiced criminal law, did not comprehend the legal effect of the *Miranda* waiver he signed. Thus, even if the court were to make the unwarranted conclusion that Giordano was in custody before the morning of July 26, 2001, the court finds that Giordano voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.

## CONCLUSION

For the reasons discussed above, Giordano's motion to suppress the Title III electronic surveillance and motion to suppress the oral statements [docs. ## 100, 103] are DENIED.