OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant is charged with two counts of criminal possession of a narcotic substance in the third degree. A pretrial hearing was held on a motion to suppress a bag containing narcotics. The issue raised at the hearing was whether police officers can properly pursue a person who enters and then leaves the courtyard of a building whose managing agent has signed on to the Police Department’s “Operation Clean Halls.”[1] Sergeant John Gilcher was the only witness at the hearing. He testified about events he observed and about what other officers told him. The motion to suppress is granted.
Testimony
Sergeant Gilcher testified that authority for the Police Department’s Operation Clean Halls was based on an agreement between a landlord or a group of tenants that allowed police to enter a particular building and the immediate area and to stop anyone found there and ask for identification. Gilcher explained that, in carrying out Operation Clean Halls, the police go up and down the stairways in a building checking the landings and the grounds for anyone who might be there. The officers stop all who are found, question them as to why they are in the building or on the grounds, and ask for identification showing that they live in the building or for an apartment number to verify a legitimate visit.
Gilcher testified he was in charge of Operation Clean Halls on the night of January 16, 1998, a windy night with drizzle. The operation involved eight police officers including Officer Chin at 3444 Corsa Avenue. The building was one of several, called the Hillside Houses, bounded by Eastchester Road, Boston Road, Corsa Avenue and Hicks Avenue. Entrances to the courtyard from the street were from Corsa Avenue and Eastchester Road; one could also enter the courtyard through a tunnel. That night, over a 2[1]/2-hour period, seven people who were coming in from the courtyard were arrested.
*629 Gilcher and his driver, Officer Wong, were in an unmarked police car. Officer Chin and another officer were inside the courtyard of the building next to the tunnel. Chin and his partner stopped two people, one a male Hispanic for trespassing. The Hispanic man fled toward Eastchester Road, and at that moment Chin saw another man, a black man in dark colored clothing, enter the courtyard from the Corsa Avenue entryway, make a U-turn and run out of the courtyard back onto Corsa Avenue. Gilcher claimed that Chin said the black man looked at him and saw the two men who were being detained.
Referring to the first man who ran, one of the two officers in the courtyard broadcasted over the radio that a male Hispanic had fled toward Eastchester Road. In response Gilcher and Wong, in their police vehicle, drove toward Eastchester Road, stopped a Hispanic man and handcuffed him. Officer Chin then approached and identified the man as the Hispanic man who had run away from the Eastchester Avenue entryway to the courtyard.
It was at the moment that Chin confronted the Hispanic man that he first told Gilcher that a black man in dark clothing entered the courtyard. Gilcher, acting on Chin’s information, left the Hispanic man with Chin and along with Wong went on to Corsa Avenue in search of the black man.
Gilcher testified that one black man was walking toward them on the sidewalk. He was wearing a dark colored coat. Gilcher did not know from where the man was coming. No one else was in the vicinity. As the black man was almost parallel with the car, Gilcher opened the door a little bit and he and Wong shouted for the black man to stop. Gilcher testified that he wanted to stop the defendant to question him “for the criminal trespass,” to see if he lived in the building or had identification documents on his person. Gilcher testified that if it turned out that the defendant had no identification documents on him, Gilcher would have had Chin come and identify the defendant as the person in the courtyard and would have issued a summons for the criminal trespass that occurred in the courtyard.
According to Gilcher, the black man, later identified as the defendant, made eye contact with him and immediately ran toward Boston Road. When the defendant started to run, Gilcher and Wong got out of the car and chased him. A marked police van blocked the defendant who was then trapped between the van and Gilcher (who was 10 feet away). The defendant *630 reached into his coat and tossed three ziplock bags onto the roof of a bodega. The bags landed on the ground. The officers arrested the defendant about five minutes after the arrest of the Hispanic man and Chin’s conversation with Gilcher on the street. Gilcher picked up the bags and found that they contained crack. Five minutes later, Chin came to the location and said the defendant “fit the description of the male he saw entering the courtyard.” He did not specifically identify the defendant. The defendant was never charged with trespassing.
Posthearing Submissions
After the conclusion of the hearing, and as part of the memorandum of law, the People attached a copy of a form that purports to be an affidavit of the managing agent of 3444 Corsa Avenue and is dated November 1, 1997. The form states that the owner or managing agent of a series of buildings, including 3444 Corsa Avenue, has asked the police to arrest anyone found trespassing in the building. The form further states that a person is trespassing in the building if the person is not a tenant, an invitee or an invited guest.
Findings and Conclusions
The question to be resolved here is whether, based on the information known to Gilcher at the time Gilcher began to chase the defendant, the chase and the consequent entrapment of the defendant between two sets of officers was a legal exercise of police power. The People argue that the form signed by the building agent was the tenants’ permission to ask anyone in the building for identification and that any inquiry made is pursuant to the permission is per se a level two inquiry under People v De Bour (40 NY2d 210 [1976]).[2] The argument continues that the De Bour level three stop and inquiry[3] is triggered when anyone refuses to comply with the police request and runs away. A refusal, assert the People, establishes reasonable suspicion to believe that “the crime of trespass has just been committed” and gives the officer the right to detain the person for questioning.
*631 The Court of Appeals has clearly articulated the rule that “[p]olice pursuit of an individual ‘significantly impede [s]’ the person’s freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being, or is about to be committed.” (People v Holmes, 81 NY2d 1056, 1057-1058 [1993], citing People v Martinez, 80 NY2d 444, 447 [1992].) The Court went on to explain that “[f| light alone, however, or even in conjunction with equivocal circumstances that might justify a request for information * * * is insufficient to justify pursuit because an individual has a right ‘to be let alone’ and refuse to respond to police inquiry”. (People v Holmes, 81 NY2d, supra, at 1058 [citations omitted].)
A stop or pursuit of a person “must be premised upon what the officer does know, namely, that there are reasons to suspect a particular individual of criminal involvement. Although an officer is entitled to inquire [on less than reasonable suspicion], he is not in our system of justice entitled to a response and may not pursue or seize a person simply because a response to his inquiry has not been forthcoming”. (People v Madera, 189 AD2d 462, 467-468 [1st Dept], affd 82 NY2d 775 [1993].) The refusal to answer the inquiry alone cannot justify the pursuit; there must be other circumstances along with the refusal that yield the requisite knowledge. (Supra, at 465.)
People v Hollman (79 NY2d 181, 190 [1992]) and People v De Bour (40 NY2d, supra, at 223) define the amount of knowledge needed by the police officer to justify each level of intrusion. Because the conduct of Gilcher and his colleagues constituted a forcible detention of the defendant in terrifying circumstances, at a minimum a level three intrusion, the People had to prove there was reasonable suspicion to believe that the defendant had committed a crime.
There was no basis to suspect that a trespass had been committed by the black man. The testimony shows that neither Chin, the officer who was in the courtyard, nor Gilcher had any idea whether the black man was committing a trespass. Gilcher testified that the officers in the courtyard had as their purpose the stopping of all people who entered the courtyard to determine if they had the right to be there: the very purpose of the officers’ presence in the courtyard was to find out if individuals there were properly present. The officers did not know anything about any particular individual until the inquiry of that person was made.
Later, when Gilcher himself began his efforts to find the black man in dark clothes and stop him to ask questions, it *632 was not because Gilcher already had information about the legality of this black man’s conduct, but to find out if he had identification papers or lived in the building and thereby to learn whether he had done anything wrong. Gilcher admitted that when he saw the defendant, he was simply walking on the sidewalk. Gilcher did not testify that the police officers knew anything about the black man in dark clothes they saw enter the courtyard. Nor did he describe any circumstances that would have led the man to believe he was not properly in the courtyard. The man had the right to refuse to answer any questions and to walk, or even to run, away from the officers. (See, e.g., People v Howard, 50 NY2d 583, 590, cert denied 449 US 1023 [1980].)
Further, as defense counsel argued, the record precludes any belief that the black man in dark clothes was committing a trespass. Penal Law § 140.05 states that a trespass occurs when a person knowingly enters or remains unlawfully in or upon the premises. “Premises” includes any building and any real property. (Penal Law § 140.00 [1].) “A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain”. (Penal Law § 140.00 [5].)
Interpreting this section, the Court of Appeals has said “it must be proved that such person ‘knowingly’ entered the premises without license or privilege and, therefore, a person who enters upon premises accidentally, or who honestly believes that he is licensed or privileged to enter is not guilty of any degree of criminal trespass”. (People v Basch, 36 NY2d 154, 159 [1975].) To state the inverse, the intruder must be aware of the fact that he has no license to enter the premises and even a mistaken belief of the right to enter precludes a finding that there was an unlawful entry trespass. (People v Uloth, 201 AD2d 926 [4th Dept 1994]; People v Ranieri, 144 AD2d 1006, 1008-1009 [4th Dept 1988], lv denied 73 NY2d 895 [1989]; People v Reed, 121 AD2d 574, 575 [4th Dept 1986].) For there to be a trespass, there must be some basis to believe that an area that appears open to the public is not in fact so open. For example, when the main lobby of a building is open to the public and a locked door separates a stairwell from the lobby, it is then reasonable to conclude that the stairwell is not open to the general public. (People v Rodriguez, 159 AD2d 201, 202-203 [1st Dept], lv denied 76 NY2d 742 [1990].)
The testimony here was that there were two entrances to the courtyard from the street and that access could be gained by a *633 tunnel as well. There was no evidence that the entrances were blocked by gates or other barriers or that the courtyard was not open to all who wished to enter. There was no evidence that signs were posted in the area informing those who came into the courtyard that they were not permitted entry or that the courtyard access was limited. (See, Penal Law § 140.10 [a], [e].)
The testimony at the hearing, given by the supervising officer involved in the incident, was that the courtyard was open to the street and he mentioned no circumstances that would lead anyone, including the officers, to believe that there were limits on who was permitted to enter the courtyard. The People did not prove that anyone would have any basis to believe this public space with public access was actually off limits. Accordingly, there was no basis for the police to believe that the black man who entered through Corsa Avenue was trespassing and accordingly there was no basis to ask him any questions under a level two inquiry.[4]
The People seek to sustain the legality of the police conduct here by relying on the managing agent’s affidavit and asserting that it is a consent to stop people who enter the courtyard. The prosecutor’s position, articulated in his posthearing memorandum, is that law abiding citizens “essentially request the Police Department to maintain a constant presence in their own buildings” to stop illegal activity and “the tenants agree to show their identification to police officers whenever asked to and even take on the responsibility of letting their visitors know the rules as well.” There is nothing in this record that supports these assertions by the prosecutor and there is no legal basis to find the form is a consent for improper police intrusion.
The form relied upon by the prosecutor is entitled “Managing Agent’s/Owner’s Affidavit.” The form is signed with the name Daniel H. Cox and the form says in its printed portions “In recent years, trespassers have come to use the buildings as a place to buy drugs and/or use them * * * Accordingly, I have asked the police department to arrest anyone found trespassing in the building.” Contrary to the People’s position, the document does not enhance the police power over the black man who was said to be momentarily in the courtyard. Although *634 the form may authorize the police to enter onto the property, the form does not diminish the rights of the individuals who are found there. The form, signed by a third party who has no known connection to the black man who entered the courtyard, does not constitute a waiver of the black man’s rights to be free from unreasonable searches and seizures. On this récord, only the black man’s conduct could limit the sanctity of his person. (See, People v Fields, 257 AD2d 387, 389 [1st Dept 1999] [an officer’s training and experience and his knowledge that a particular bus route was previously the “source of drug trafficking arrests” does not elevate the defendant’s conduct so as to provide a founded suspicion that criminal activity is afoot].) Indeed, the issue in this case derives from the principle that it is the actions of the individual suspect that govern how the police can respond to the suspect. (E.g., People v De Bour, 40 NY2d, supra, at 125; People v Townes, 41 NY2d 97, 100 [1976]; People v Stewart, 41 NY2d 65, 66 [1976].)
Further, the People have presented no acceptable legal theory as to how the building agent’s signature on the form as a matter of law authorizes a level two De Bour inquiry of anyone in the courtyard and how flight automatically raises the permissible police conduct to a level three intrusion. The form itself does not provide a basis to believe that a particular person present is involved in a situation in which criminal activity is afoot any more than presence in a “high crime area” standing alone provides such a basis. (See, e.g., People v Holmes, 81 NY2d, supra, at 1058; People v Cornelius, 113 AD2d 666, 672 [1st Dept 1986].) As Judge Fuchsberg said, concurring in People v McCray (51 NY2d 594, 606-607 [1981]): “Arrests are made of individuals, not of neighborhoods. When we single out the latter, more likely than not congested areas peopled in the main by those who are socially and economically deprived, we subject all its residents, the vast majority of whom are sure to be free of criminal taint, to an immeasurably greater risk of invasion than those who live elsewhere. The inevitable result is a measurable abridgement of the Fourth Amendment’s protection against police intrusions conducted without sufficient justification.” The People’s attempt to use flight to justify a level three intrusion is an effort to bootstrap flight into a legally significant act, and the precedents of this State reject that.
Although the People’s reliance on the form in this case is unfounded, this case does not preclude proper posting of a trespass notice, even in outdoor areas, so that these areas are *635 clearly marked as off limits to all but those authorized to enter. Further, it does not prevent the landlord or agent from blocking the entrances with the consequent effect of putting all who seek to enter on notice of the landlord’s rules for entry. There was no such notice here, and the police conduct was improper.

. A second issue, whether the People established that the defendant was the person in the courtyard, is not discussed in this edited opinion.

. A level two inquiry under People v De Bour is a common-law inquiry and is activated by a founded suspicion that criminal activity is afoot. At this level, a police officer is allowed to “interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure.” (40 NY2d, supra, at 223.)

. A level three inquiry is based upon reasonable suspicion that a person has committed a crime and authorizes a forcible stop and frisk of that person. (People v De Bour, 40 NY2d, supra, at 223.)

. The People do not assert that the abrupt U-turn by the black man gave any additional basis to believe that the man’s conduct raised any suspicion. As already discussed, it could not have done so because there was no other basis to ask the man anything.