UNITED STATES of America,
Plaintiff,

v.

Bill BELLAMY, Defendant.

No. 08–CR–204 (KAM).

United States District Court,
E.D. New York.

Jan. 9, 2009.

310

Patrick Sean Sinclair, United States Attorneys Office, Brooklyn, NY, for Plaintiff.

Douglas G. Morris, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant.

### MEMORANDUM & ORDER

MATSUMOTO, District Judge:

Before the court is defendant Bill Bellamy's motion to suppress all physical evi-

dence seized on January 24, 2008, including a Ruger .357 revolver, ammunition, marijuana, crack cocaine, and "ziplock" bags containing those drugs and several pieces of paper. Bellamy is charged with (1) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 3551 *et seq.*; (2) possession with intent to distribute cocaine base and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 841(b)(1)(D), and 18 U.S.C. §§ 3551 *et seq.*; and (3) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 3551 *et seq.* (*See* dkt. no. 7, Indictment.)

The court held a suppression hearing on July 24, 2008, at which the government presented one witness, New York City Police Department (NYPD) Officer Jason Ianno. Defendant similarly called one witness, Mr. Phillip Martin, an investigator for the Federal Defenders of New York.

The court ordered post-hearing supplemental briefing regarding specified issues on September 17, 2008, and granted the parties an extension to make submissions, the last of which was submitted by defendant on November 13, 2008. Upon consideration of the parties' written submissions and the testimony and evidence presented at the suppression hearing, and for the reasons stated below, the court grants defendant's motion to suppress the marijuana, crack cocaine, and "ziplock" bags containing those drugs and several pieces of paper, and denies defendant's motion to suppress the Ruger .357 revolver and ammunition.

## I. FACTUAL FINDINGS

Officer Jason Ianno, whose testimony the court finds credible, has been a police officer with the NYPD for four years, assigned to patrol the 81st Precinct, which includes the Bedford Stuyvesant section of Brooklyn, New York. As a police officer, Officer Ianno received specialized training in narcotics packaging and arrests. He testified that a typical form of packaging for marijuana is to use small, jewelry-sized ziplock plastic bags, larger ziplock bags and cigarette wrappers. On a number of occasions, Officer Ianno has consulted with the NYPD Street Narcotics Unit (SNU), a precinct based unit that investigates and makes arrests for narcotics offenses. (Transcript of Suppression Hearing ("Tr.") 5–7.)

Officer Ianno is familiar with and has had training in the City's Field Trespass Affidavit Program (FTAP). FTAP is a program in which a landlord or owner of a premises executes an affidavit at the precinct, permitting the police to enter the building to ensure that individuals, who are neither tenants nor guests of tenants, are not allowed to loiter, trespass or conduct other illegal activities inside the building. Officer Ianno is not responsible for administering the FTAP program or for the filing of FTAP affidavits. (Tr. 7–8.)

Officer Ianno understood that on January 24, 2008, the Buckingham building, located at 165 Van Buren Street in Brooklyn, New York, was active in the FTAP program. He knew that the Buckingham building was a drug prone location because he worked "all the time" with the SNU team, which "keeps an eye" on the building and whether its FTAP affidavit is current. (Tr. 40–41.) Officer Ianno testified that, in addition to the FTAP affidavits, buildings that participate in the FTAP program have signs posted on the outside usually stating "no trespassing" or "tenants and their guests only." (*Id.* at 8.) On January 24, 2008, the Buckingham building, located in a "drug prone," high-crime area, had a sign posted over the doorway indicating "Tenants and their Guests ONLY—No

Trespassing." (Tr. 13, 19, 37; Gov. Hr'g Ex. 3A.)

Prior to January 24, 2008, Officer Ianno had patrolled the vicinity around the Buckingham building, at the corner of Van Buren Street and Marcus Garvey Boulevard,[1] and testified that complaints of trespass in the vicinity were a "common occurrence," and that he would answer at least one such complaint a night in that area. Officer Ianno also recalled making two arrests for drug trafficking in the vicinity of the Buckingham building. He did not receive any complaints about trespassers or drug trafficking on the evening of January 24, 2008. (Tr. 16–17, 36–37.)

On January 24, 2008, at approximately 8:30 p.m., Officers Ianno and Edgar Gonzalez were in uniform, patrolling the 81st precinct in a marked police van driven by Officer Gonzalez. The officers were driving westbound[2] on Van Buren Street, toward the intersection of Marcus Garvey Boulevard. As the police van approached the Buckingham building, Officer Ianno looked through its wire mesh door into the lighted vestibule and observed Bellamy, whom he described as a "suspicious-looking gentleman" and as a large black male

wearing a "dark lidded cap" and dark jacket, standing in the front vestibule. (Tr. 8–9, 14, 18–19.)

Officer Ianno perceived Bellamy as a suspicious individual because Bellamy "appeared to be waiting for somebody," indicating the possibility that Bellamy was engaged in a "drug transaction" or "trespassing possibly in a drug transaction," in an FTAP location. (Tr. 19.) Officer Ianno, however, did not testify regarding the length of time that he was able to observe Bellamy as he and Officer Gonzalez drove by in the police van. (*Id.*) Officer Ianno suspected Bellamy of trespassing based on prior complaints of trespassing in the area and the officer's understanding that the owner of the Buckingham building participated in the NYPD's FTAP program.[3] (Tr. 7–8, 19, 36–37; Compl. ¶ 4.)

After seeing Bellamy through the Buckingham building's door, the officers decided to stop him. (Tr. 19.) Accordingly, they circled the block and parked the police van on the southbound, left side of Marcus Garvey Boulevard near the corner of Van Buren Street, behind the Buckingham building line and along side the edge of the building, out of sight of the build-

1. Marcus Garvey Boulevard lies on the border between the 79th and 81st precincts. (Tr. 17.)

2. Although Officer Ianno initially testified that he and Officer Gonzalez were traveling eastbound on Van Buren Street (Tr. 9), he subsequently corrected his testimony to state that they were traveling westbound on Van Buren Street toward the intersection of Marcus Garvey Boulevard. (Tr. 18.)

3. Although the managing agent of the Buckingham building had signed FTAP affidavits prior to January 24, 2008, the FTAP affidavit for the Buckingham building had expired as of December 5, 2007, and was not renewed until February 8, 2008. (Tr. 40–46; Def.'s Hr'g Ex. A.) Thus, Officer Ianno's understanding of the Buckingham's participation in FTAP was technically incorrect. This misun-

derstanding of fact was reasonable and has no bearing on the legal determination herein regarding whether reasonable suspicion existed for Bellamy's *Terry* stop. *See, e.g., Maryland v. Garrison*, 480 U.S. 79, 88, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (officers' mistake of fact regarding the breadth of a search warrant did not render the search unconstitutional); *Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (where police had probable cause to arrest one party, and reasonably mistook a second party for the first party, the arrest of the second party is valid); *U.S. v, Elliott*, 50 F.3d 180, 187 (2d Cir.1995) (a police officer's reasonable mistake of fact about a landlord's authority to consent to a search of an apartment does not invalidate a search of the apartment).

ing's entrance "so the van wouldn't be observed." (*Id.* at 20–21.) Upon exiting the vehicle, but before approaching the Buckingham building entrance, Officer Ianno observed another man coming from the general vicinity of the Buckingham building toward Marcus Garvey Boulevard where the officers' van was parked.[4] This second man, an "unkempt" black male, wearing a black hat, dark pants and a dark jacket, appeared to Officer Ianno to be addicted to crack, but not currently under the influence of drugs. (Tr. 21–23, 56–57.) Officer Ianno stated that, as a police officer, he has "daily" encounters with individuals under the influence of, or addicted to, drugs. Officer Ianno did not observe this second individual interact with anyone else, describe any facts or express any belief that this second person had been engaged in a drug transaction or other criminal activity. The officers did not stop this individual or ask him any questions. (Tr. 22, 56–57.)

When the officers rounded the corner from Marcus Garvey Boulevard onto Van Buren Street, they walked onto a wheelchair-accessible ramp leading from the entrance of the Buckingham building. (Tr. 23.) Looking straight at the entrance to the building, the ramp to the sidewalk is on the left side of the door and stairs leading from the door to the sidewalk are on the right side of the door. (Def. Mot., Ex. E.) As the officers walked onto the ramp, they observed Bellamy coming down the ramp toward the officers. (Tr. 23; Compl. ¶ 5.) Upon observing the uniformed officers, Bellamy "started to make furtive

movements," and "started moving his eyes back and forth as though looking for an escape." (Tr. 23.) Officer Ianno stated that Bellamy moved his eyes back and forth repeatedly, although he did not count the number of times that he did so, and was about fifteen feet away from the officers. (Tr. 25–26, 59–60.) Officer Ianno defined "furtive movements" as "a nervous movement indicative of someone being nervous or someone who's ... got something that they're trying to hide." (Tr. 59.) Officer Ianno also testified that Bellamy took a "stutter step,"[5] describing it as follows: "It's basically when you're approaching, you see something that catches you by surprise and you kind of freeze for a second as you're moving." (Tr. 24, 59.)

The officers did not recognize Mr. Bellamy or have any knowledge of him before January 24, 2008. (Tr. 58.) The officers approached and asked Bellamy if he lived in the building, to which he responded affirmatively. (Tr. 23, 60.) The officers did not know if Bellamy answered them truthfully at the time he responded that he lived in the building. (Tr. 60.)

Officer Ianno took Bellamy "by the elbow," turned him around in a counterclockwise direction and "brought" Bellamy back up the ramp to the area in front of the entrance of the Buckingham building, where there was better, direct light from two exterior lights and the interior vestibule light. (Tr. 24–25.) Officer Ianno recalled that there was no direct light in the middle of the ramp where the officers first encountered Bellamy.[6] Officer Ianno tes-

---

**4.** The Complaint does not mention this second individual.

**5.** The court notes that the prosecutor, not Officer Ianno first described defendant's movement as a "stutter step". (Tr. 24.) Nevertheless, on cross-examination, Officer Ianno affirmatively responded to the following question: "And you base your characterization of

my client as furtive because he took what you describe as a stutter step?" (Tr. 59.)

**6.** Phillip Martin, the defendant's sole witness, testified that he took photographs of the front of the Buckingham building on April 22, 2008, between 9:00 and 9:30 p.m., using a camera capable of illustrating the relative

tified that there was also a streetlight on the corner that provided direct light. (Tr. 25.)

Officer Ianno turned Bellamy around so that Bellamy's face was to the wall and his back was to the officers. (Tr. 68.) Officer Ianno asked Bellamy for identification, which he agreed to provide. (Tr. 23, 60.) After responding that he possessed identification, Bellamy reached for his identification with his left hand toward his left front pocket[7] (Tr. 23, 27, 69), at which time Officer Ianno observed a plastic ziplock bag protruding from Bellamy's left back pocket in which he could see another smaller bag containing marijuana.[8] (Tr. 23, 27, 69.) Officer Ianno then removed the bag from Bellamy's pocket, showed it to Officer Gonzalez, and placed it in his own pocket. (Tr. 23–24, 27.) The officers did not ask Bellamy any other questions (Tr. 23–24, 27, 60–61) and Bellamy made no other statements during his encounter with Officers Ianno and Gonzalez on the entrance ramp of the Buckingham building (Tr. 78).

Officer Gonzalez, who was standing slightly to Bellamy's left, then instructed Bellamy to place his hands behind his back so that the officer could handcuff Bellamy. (Tr. 27.) Before Officer Gonzalez could

secure the handcuffs, however, Bellamy suddenly shouldered Officer Ianno in the chest and began struggling with Officer Gonzalez. As a result of Bellamy's blow to his chest, Officer Ianno, who was standing slightly to Bellamy's right and at the edge of the stairs leading to the Buckingham building's entrance, lost his footing and fell down the stairs. (Tr. 28–29.) As Officer Ianno fell, he grabbed hold of Bellamy's clothing and wrapped his arms around Bellamy's legs (Id.), while Officer Gonzalez also struggled with Bellamy (Tr. 30).

Bellamy dragged both officers down the stairs, out into the street, near a parked car. (Tr. 30–32; Gov. Hr'g Ex. 2.) Throughout the struggle, Officer Ianno tried to regain his footing by repeatedly "clawing" his way up Bellamy's clothing and getting hold of Bellamy's jacket, but each time tearing it, falling and losing his footing again. (Tr. 31–32.) At some point, as Officer Ianno grabbed Bellamy's jacket, it tore completely off of Bellamy, and Officer Ianno saw and heard a handgun drop from the defendant onto the street. (Tr. 32–33, 81; Gov. Ex. 6.)

Managing to break free from the officers, Bellamy fled the scene, running eastbound along Van Buren Street. (Tr. 32–34.) Officer Ianno picked up the handgun,

lighting at night. The photographs show a floodlight and lights from apartments above that illuminate the wheelchair-accessible ramp on which the officers and Bellamy were standing. (Tr. 91–98; Def.'s Exs. J–M.) Although the court credits Mr. Martin's testimony, there is no evidence that the apartment lights were on, or that the floodlight was present, or, if there, operational, on January 24, 2008, the night of the incident in question. The only evidence regarding the lighting conditions on January 24, 2008, is Officer Ianno's testimony, which the court finds credible.

7. The court finds credible Officer Ianno's testimony that Bellamy reached toward his left front pocket to retrieve his identification. Defense counsel cross-examined Officer Ianno

about whether Bellamy reached for his left front pocket or left back pocket based on documents (Def.'s Hr'g Exs. G, H) that contradicted Officer Ianno's testimony on direct. However, these documents were not written, signed, or seen by Officer Ianno prior to the hearing. Officer Ianno admitted that he was interviewed by other officers while he was being treated for injuries at the hospital after Bellamy's arrest, and by the Kings County District Attorney regarding his encounter with Bellamy. (Tr. 71–76, 81–83, 89.)

8. The contents of the bag later tested positive for marijuana and cocaine base. (Tr. 27–28; Gov. Hr'g Ex. 5; Compl. ¶ 6.)

informed Officer Gonzalez of the gun, and both officers pursued him down the street. Bellamy was later apprehended in front of 183 Lewis Avenue, between Van Buren Street and Green Avenue. (Tr. 34.) After Bellamy was apprehended, Officer Ianno identified him as the same person the Officer had seen in the vestibule at 165 Van Buren Street, and from whom he had recovered the drugs (Gov. Hr'g Ex. 5) and the firearm (Gov. Hr'g Ex. 6). (Tr. 35.) Bellamy was then arrested and subsequently indicted.

## II. DISCUSSION

Consistent with the Fourth Amendment, "the police can stop and briefly detain a person for investigative purposes." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such a detention is known as a *Terry* stop, and requires that "the officer [have] a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994) (officer must have "reasonable suspicion" to perform a *Terry* stop), *cert. denied*, 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994).

The parties do not dispute that Bellamy's encounter with Officers Ianno and Gonzalez constituted a *Terry* stop requiring reasonable suspicion. (*See* Tr. 110–11) (admitting that a *Terry* stop occurred but arguing that reasonable suspicion existed to justify it). Rather, they dispute whether reasonable suspicion existed to support Bellamy's *Terry* stop.

To determine whether there was reasonable suspicion for a *Terry* stop, the court must first determine the precise moment that the *Terry* stop was executed by the officers, i.e., when Bellamy was "seized," because only "the facts available to the officer at the moment of the seizure" may be evaluated in determining whether reasonable suspicion warranted the detention. *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868. The court must then determine whether, based on the facts known to the officer at the time of seizure, there was some objective justification for stopping the individual that is more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868) (internal quotation marks omitted)).

### A. The Seizure

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (a seizure has occurred when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"); *Gardiner v. Inc. Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir.1995).

Defendant asserts that he was seized "as soon as [Officer Ianno] physically restricted his movement." (Def.'s Mem. ¶ 8.) Certainly, Bellamy's movement was impeded when Officer Ianno took him "by the elbow," turned him around so that his back was facing the officers, and led him up the ramp to the entrance of the Buckingham building. (Tr. 23–26.) Thus, Officer Ianno exerted "physical force"

over, and maintained physical contact with, Bellamy.[9] Moreover, both officers restrained Bellamy's liberty by directing him, rather than merely requesting that he move,[10] up the ramp. *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382; *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870; *see also United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990) (enumerating factors relevant to seizure inquiry, including "physical touching of the person by the officer"). In short, a reasonable person in Bellamy's shoes would not have concluded at that point that he was free to leave. *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382. The court thus concludes that Bellamy was "seized," as that term relates to the Fourth Amendment, when Officer Ianno took Bellamy by the elbow and turned him around and walked him up the ramp. *See California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement").

## B. Reasonable Suspicion

 In determining that the seizure of Bellamy occurred when Officer Ianno took Bellamy by the elbow and turned him around, the court must next address whether the officers possessed reasonable suspicion at that time. *Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their" seizure). As the Supreme Court stated in *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996),

> The principal components of a determination of reasonable suspicion ... will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.... The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: The historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.

(internal quotations omitted)(alterations in original). While "[a]rticulating precisely what 'reasonable suspicion' ... mean[s] is not possible," *Ornelas,* 517 U.S. at 695, 116 S.Ct. 1657, the Supreme Court has described it as "a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the offi-

---

**9.** Officer Ianno testified that he was unaware of whether Officer Gonzalez also touched defendant. (Tr. 68.)

**10.** This is not a case, as the government intimates, involving a police officer's *mere request* that an individual move to a safer or more convenient location. *See, e.g., United States v. Springer,* 946 F.2d 1012, 1016–17 (2d Cir. 1991) (no seizure found where officer's suggestion that defendant "move from the curb

was prompted by a desire to secure a safe and convenient place to talk, not to imply coercion or confinement"); *United States v. Hooper,* 935 F.2d 484, 487, 492 (2d Cir.1991) (no seizure occurred when defendant consented to questioning and request to move to less congested area). Rather, in the instant case, Officer Ianno physically restrained Bellamy by taking hold of his arm and moving him to another location.

cer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.2000) (citing *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir.1992)).

Further, "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *Lee*, 916 F.2d at 820; *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (courts must look at the "totality of the circumstances" when making reasonable suspicion determinations). The court evaluates the totality of the facts, from the perspective of a trained and experienced officer. *Cortez*, 449 U.S. at 418, 101 S.Ct. 690.

Applying this standard, the court concludes that the information available to Officers Ianno and Gonzalez at the time of defendant's seizure arguably could cast suspicion over Bellamy's actions; however, it falls short of reasonable suspicion warranting Bellamy's *Terry* stop. This information included (1) the officers' knowledge that the Buckingham building was located in a high-crime, drug-prone neighborhood; (2) the officers' knowledge that the Buckingham building had experienced problems with drug trafficking and trespassing; (3) the officers' understanding that the building had participated in FTAP; (4) Bellamy's presence in the Buckingham vestibule; (5) the presence of the supposed "crack addict" outside of the Buckingham building; and (6) Bellamy's furtive gestures.

Officer Ianno observed Bellamy, through the Buckingham's mesh door,[11] standing alone in the building's vestibule as the officers drove by in their van. According to Officer Ianno, Bellamy "appeared to be waiting for somebody," which indicated to the officer the possibility of a trespass or drug transaction. However, the fact that an individual appears to be waiting for someone does not establish reasonable suspicion that an individual is engaged in criminal activity. This is especially true in the instant case where the events in question took place in New York in January, when it would not be uncommon for an individual to stand in a vestibule to avoid the cold. Furthermore, Officer Ianno did not testify that he observed Bellamy in the vestibule for any length of time. Indeed, it is unlikely that the officer could have observed Bellamy for more than a few seconds. Considering that these events occurred at approximately 8:30 p.m., a time when it is typical for people to come and go from an apartment dwelling, a brief observation of an individual in an apartment building vestibule does not establish reasonable suspicion. *See United States v. Blair*, 524 F.3d 740, 751 (6th Cir.2008) (officer "did not have reasonable suspicion to suspect [the defendant] of criminal activity simply because he was driving in a bad neighborhood at 10:30 at night").

Moreover, the fact that the Buckingham building is located in a high crime area is not sufficient to cast these circumstances in a suspicious light. Although "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (citing *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct.

---

11. The government's Hearing Exhibit 8 is a photograph of the Buckingham's mesh door.

The court notes that the metal mesh on the door significantly impedes visability.

2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.")).

Similarly, Officer Ianno's understanding that the Buckingham building was participating in the NYPD's FTAP program does not "provide a basis to believe that a particular person present [on the premises] is involved in ... criminal activity ... any more than presence in a 'high crime area' standing alone provides such a basis." *People v. Powell*, 180 Misc.2d 627, 691 N.Y.S.2d 263, 268–69 (Sup.Ct.1999) (although participation in FTAP may authorize the police to enter a property, it "does not diminish the rights of the individuals who are found there").

When the officers decided to approach Bellamy, they attempted to "surprise" him by parking their van out of view from the Buckingham entrance, walking around the corner from Marcus Garvey Boulevard onto Van Buren Street and then approaching him. Upon approaching Bellamy, Officer Ianno observed "furtive" movements by Bellamy.[12] Officer Ianno described Bellamy's "stutter step" upon seeing the officers as follows: "when you're approaching, you see something that catches you by surprise and you kind of freeze for a second as you're moving" and further stated that Bellamy darted his eyes from side to side "as if looking for an escape." (Tr. 23–24, 59–60.)

Undoubtedly, the Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), *Florida v. Rodriguez*, 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam), and *Sokolow*, 490 U.S. at 8–9, 109 S.Ct. 1581); *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("deliberately furtive actions and flight at the approach of strangers or law enforcement officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest"). However, furtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion. *See e.g., Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (holding that an investigatory stop of the defendant could not be based on the mere fact that defendant had occasionally looked backward at another person as they proceeded through an airport concourse, even though defendant had arrived from a city that was a principal place of origin of cocaine, the defendant had arrived in the early morning, when law enforcement surveillance activity was reduced, defendant and his companion appeared to be trying to conceal the fact that they were traveling together, and defendant and his companion apparently had no luggage other than their shoulder bags); *U.S. v. Berryman*, 717 F.2d 651, 654 (1st Cir.1983)(noting the lack of articulable suspicion based on DEA agents' observations that defendant had

---

**12.** Although Bellamy exhibited purportedly furtive behavior upon seeing the police officers, it is noteworthy that he initially did not flee at their sight and otherwise appeared willing to cooperate with the officers by responding to their questions and directives. *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673

("Headlong flight—wherever it occurs—is the consummate act of evasion."); *United States v. Guadalupe*, 363 F.Supp.2d 79, 83–84 (D.Conn.2004) (defendant's presence in a high crime, "no trespassing" area, coupled with his flight upon observing officers, constituted reasonable suspicion).

arrived from Fort Lauderdale, that he walked quickly and looked over his shoulder once, and that he stood five or ten feet from the baggage carousel, looked around several times, and picked up one bag); *People v. Brock*, 154 A.D.2d 231, 545 N.Y.S.2d 717 (1989) (defendant's "unnatural positioning" and "furtive" movements, upon being pulled over in a drug-prone area, were not sufficient to rouse suspicion); *cf. United States v. Haye*, 825 F.2d 32, 34 (4th Cir.1987) (while the defendants' furtive gestures initially did not provide a basis for reasonable suspicion at the time of the initial encounter, one defendant's admission—when he was fully free to leave—that the bag he was holding contained cocaine, and the other defendant's flight upon being questioned by DEA agents, and the agents' observation that the second defendant had a bulge in his pants, provided probable cause to arrest); *United States v. Pajari*, 715 F.2d 1378, 1382–83 (8th Cir.1983) (concluding that defendant's nervous appearance after defendant left an apartment building where he stayed for approximately twenty minutes, when combined with reliable tips that defendant was a major cocaine trafficker, after at least one informant had purchased cocaine from defendant, and upon a specific tip that defendant would be leaving his residence at a certain time to purchase cocaine, amounted to reasonable, articulable suspicion); *People v. Bellamy*, 254 A.D.2d 188, 680 N.Y.S.2d 481, 482 (1998) (officers observed defendant and co-defendant running in the early morning, one defendant carrying a woman's handbag, exhibiting nervous behavior and separating upon seeing the patrol car, together with the other defendant's furtive gesture to his waistband as if he were discarding something, the co-defendant's voluntary statement that he found the handbag, and both defendants' inability to explain where they found the bag, justified their brief detention).

■ In this case, the additional indicia accompanying Bellamy's furtive gestures do not provide a basis for reasonable suspicion when viewed in totality. To further justify Bellamy's stop, the government also relies on the officers' observation of a second individual who was crossing the street outside of the Buckingham as the officers approached the building prior to stopping Bellamy. Officer Ianno testified that this individual appeared to be addicted to crack. (Tr. at 22.) Even accepting this testimony, Officer Ianno did not observe any interaction between Bellamy and this individual; thus, there could be no reasonable suspicion that Bellamy was involved in a drug transaction or other criminal activity with him. *See Blair*, 524 F.3d at 750 (finding clear error in district court's factual determination that officer knew that defendant's car had just left a known drug house when officer did not personally see the car leave that location and where information provided by other officer was not specific enough to reach that conclusion). Accordingly, the court cannot conclude that the sight of a completely unrelated individual on the street outside the Buckingham, at a time of evening frequented by pedestrians, establishes reasonable suspicion that Bellamy was engaged in criminal activity. *See United States v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir.1994) (noting that "it is not reasonable to assume that all of the persons at a public bar have" some connection with one another).

Furthermore, reasonable suspicion did not arise upon the officers' approach of Bellamy. When the officers asked Bellamy whether he resided at the Buckingham and he answered in the affirmative, the officers had no reason to doubt the veracity of Bellamy's response at that time. Of-

ficer Ianno did not testify that Bellamy was evasive in answering the only inquiry that the officers posed to him, i.e., whether Bellamy lived in the Buckingham building. *Cf. People v. Febus,* 11 A.D.3d 554, 783 N.Y.S.2d 55, 55 (2004) (reasonable suspicion existed where defendant answered "nothing," when asked what he put in his pocket after an officer observed him look into his hand at small plastic bags while standing in a drug-prone area, followed by defendant's startled look at the sight of the officer, and defendant's evasive placement of the bags into his pocket); *People v. Fernandez,* 261 A.D.2d 178, 691 N.Y.S.2d 386, 387 (1999) (defendant's inability to provide a reasonable response regarding his presence in the building contributed to suspicion); *In re Bobby J.,* 249 A.D.2d 305, 670 N.Y.S.2d 598, 599 (1998) (arrest for criminal trespass lawful where defendant appeared nervous and initially attempted to avoid the officer, was present in building which was posted with a "no trespassing" sign in a high-crime area, gave vague and evasive responses to questions regarding his presence in the building, and failed to provide a valid reason for being there).

Further, Officer Ianno testified that he did not recognize Bellamy, nor did he know whether Bellamy resided in the Buckingham building. Officer Ianno testified that there had been no complaint of trespassing on the Buckingham premises on the night of January 24, 2008 and the officers had not been informed of any other criminal activity by an individual matching defendant's description. Thus, there was no alternative basis to suspect that Bellamy was trespassing or engaging in any other crime. *See Powell,* 691 N.Y.S.2d 263, 267 (Supr.Ct.1999) (finding no basis to suspect defendant of trespassing because the officers had no knowledge of the defendant or his rights to be on the premises). *Cf. United States v. Muhammad,* 463 F.3d 115, 118, 123 (2d Cir.2006) (a detailed de-

scription by an anonymous tipster "that a black man, attired in a white sweat suit and carrying a gun, was riding a bicycle" down a specific street, coupled with the rapid identification of the bicyclist who was in a high-crime area and his attempt to flee upon his seeing the officers, established reasonable suspicion); *People v. Wright,* 257 A.D.2d 365, 684 N.Y.S.2d 507, 507 (1999) (reasonable suspicion found where police, responding to a burglary in progress at 5:30 a.m., saw defendants near reported crime scene behaving furtively, and, upon seeing the police, defendants fled). Moreover, the officers did not witness anything to suggest that Bellamy was armed, dangerous, or otherwise on the brink of jeopardizing the officers' safety.

Consequently, the court cannot conclude that Bellamy's furtive gestures coupled with the additional facts available to Officers Ianno and Gonzalez, as presented to the court, establish a reasonable basis for a particularized suspicion that Bellamy was selling narcotics, trespassing or otherwise violating the law. Therefore, there was no reasonable suspicion warranting Bellamy's *Terry* stop.

Following Bellamy's seizure, the officers discovered the evidence at issue: the marijuana, crack cocaine, "ziplock" bags containing those drugs and several pieces of paper, and the Ruger .357 revolver and ammunition.

### C. Exclusion of Evidence

The exclusionary rule bars from trial evidence that is obtained during or as a direct result of an unconstitutional seizure. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Evidence that flows from the initial illegality is considered "fruit of the poisonous tree" and is subject to the exclusionary rule. *See Wong Sun v. United States,* 371 U.S.

471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ After seizing Bellamy and requesting identification, the officers saw a ziplock plastic bag protruding from his back pocket. (Tr. 23, 27, 69.) Upon examining the bag and determining that there was probable cause to believe it contained drugs, the officers seized the bag and started to handcuff Bellamy. (Tr. 23–24, 27–29.) The court finds that the marijuana, crack cocaine, and "ziplock" bags containing those drugs as well as several pieces of paper were discovered incident to the unconstitutional seizure and they are suppressed pursuant to the exclusionary rule.[13]

As the officers attempted to handcuff Bellamy, he "shouldered" Officer Ianno in the chest, with a force that caused Officer Ianno to fall to the ground. A struggle immediately ensued between the officers and Bellamy, in which Bellamy's forceful attempt to escape dragged the officers away from the doorway of the Buckingham building, down the entry stairs, across the sidewalk and into the street near a parked vehicle. It was after the blow to Officer Ianno, during the ongoing struggle, that the Ruger .357 loaded revolver fell from Bellamy's jacket onto the ground. (Tr. 28–33, 81.)

Bellamy argues that the Ruger .357 revolver and ammunition are inadmissible because the officers were in the process of an illegal seizure when Bellamy shouldered Officer Ianno and struggled with both officers. Bellamy asserts that, but for the illegal conduct by the officers, he would never have struggled and the revolver would never have been discovered. Therefore, according to Bellamy, the revolver and ammunition should be suppressed.

■ The court rejects Bellamy's contention that the loaded handgun should be suppressed. The poisonous tree doctrine does not extend as far as a "but for" causation test might take it. *See Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407. The exclusionary rule addresses the admissibility of evidence directly relating to a wrong perpetrated by an investigating officer. As a result, suppression is not warranted where the connection between the discovery of the evidence and the conduct of the police has "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). An intervening act of defendant's free will can serve to "purge the primary taint of unlawful invasion" and allow admission of the evidence. *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407 (holding that defendant's statements to officers in his bedroom were too closely consequent to the unlawful invasion to reasonably infer that such statements were an act of free will).

While Bellamy's shouldering of Officer Ianno and subsequent struggle with and escape from both officers were consequent to the officers' unlawful stop, Bellamy's acts constituted illegal acts—assault and resisting arrest—and, as such, purged any subsequently discovered evidence of the taint from the unlawful stop. The Second Circuit has yet to specifically address whether a defendant's unlawful conduct following an unconstitutional stop or seizure by the police permits the admission of

---

13. Because the marijuana, crack cocaine, and "ziplock" bags containing those drugs as well as several pieces of paper were discovered in the course of the unlawful stop and are hereby suppressed, the court need not reach the government's argument that this evidence would have been admissible pursuant to the inevitable discovery doctrine, as Officer Ianno's testimony establishes that the attempted initial arrest was based on the discovery of this evidence.

evidence discovered subsequent to the defendant's unlawful act. However, the Second Circuit has recognized that it would be "an unwarranted extension of the [fruit of the poisonous tree] doctrine to apply it . . . to a new wrong committed by defendant." *United States v. Remington*, 208 F.2d 567, 570 (2d Cir.1954); *see also United States v. Awadallah*, 349 F.3d 42, 81, 81 n. 8 (2d Cir.2003) (Straub, concurring). Additionally, other circuits have held that if a defendant's response to an illegal stop "is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime," and any evidence uncovered by a search incident to that arrest should not be suppressed as the "fruit of the poisonous tree" and is thus admissible against the defendant. *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir.1982) (following what the court assumed to be an illegal arrest, suspect fled, struggled and struck officer, attempted to grab officer's gun and was subsequently subdued and arrested; evidence found in subsequent search of defendant was admissible). *See also United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir.1997) (although initial stop and pat-down were unconstitutional as officer lacked reasonable suspicion, court held that previously suppressed gun was lawfully seized and admissible against defendant because the defendant subsequently fled and fired handgun at officer); *United States v. Dawdy*, 46 F.3d 1427, 1430–31 (8th Cir.1995) (reversing district court's suppression of evidence finding that even if defendant's initial stop and arrest were invalid, defendant's resistance and scuffling in response to illegal stop and officer's attempt to handcuff defendant provided independent grounds for subsequent arrest and search incident to arrest); *United States v. Waupekenay*, 973 F.2d 1533, 1537 (10th Cir.1992) (holding that evidence, obtained following illegal entry by police into home where defendant

brandished semi-automatic rifle, should not be suppressed as fruit of the poisonous tree); *United States v. King*, 724 F.2d 253, 256 (1st Cir.1984) (even if police unlawfully detained defendant and his companion and attempted to illegally search defendant, police had probable cause to arrest and search defendant after his companion began firing gun at police and fruits of search were admissible); *United States v. Garcia*, 516 F.2d 318, 319–20 (9th Cir.1975) (finding that district court properly denied suppression of marijuana because, even assuming that the initial stop of defendant's vehicle at fixed border checkpoint was illegal, defendant's subsequent high speed flight in automobile provided probable cause to arrest and search defendant); *United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir.1971) (assuming initial arrest was illegal, defendant's forcible attempt to escape, flight in vehicle at excessive speed, and shots taken at police officer provided probable cause for subsequent arrest and search, and fruits of search were admissible). Allowing a defendant who responds to an unconstitutional stop with an illegal act to benefit from the exclusionary rule would immunize that defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct. *Bailey*, 691 F.2d at 1017.

In this case, Bellamy argues that his acts do not constitute crimes because the officers lacked probable cause to arrest him based on the state law crimes with which he was initially charged: resisting an authorized arrest (N.Y. Penal L. 205.30) and assault on an officer performing a lawful duty (N.Y. Penal L. 120.05(3)). According to the defendant, because these crimes respectively require that the arrest of Bellamy was "authorized" or "lawful," and the initial stop was unconstitutional, the officers were not effecting a "lawful"

or "authorized" arrest. Therefore, according to Bellamy, the elements of the charged crimes are not satisfied and his acts do not purge the subsequently discovered evidence of the taint from the original unlawful *Terry* stop. The court disagrees.

In assessing whether a defendant has committed a crime following unconstitutional police conduct, circuit courts rely on an objective analysis of the circumstances to determine whether there was probable cause to arrest for a distinct crime. *See, e.g., Dawdy,* 46 F.3d 1427, 1431 (8th Cir. 1995). The court, therefore, need not determine whether there was probable cause to believe that the defendant committed the specific provisions of the state law crimes with which he was initially charged, because there was clearly probable cause to believe that defendant committed the two distinct crimes of assault and resisting arrest pursuant to N.Y. Penal L. 120.00(1) and N.Y. Penal L. 35.27. In *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004), the Supreme Court instructed that an arresting officer's state of mind, except to the facts known to the officer, is irrelevant to the existence of probable cause, and that the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153, 125 S.Ct. 588. In *Devenpeck,* the Court ruled that a warrantless arrest is lawful under the Fourth Amendment even when the criminal offense for which there is probable cause to arrest is not "closely related" to the offense stated by the arresting officer at the time of arrest. *Id.* at 148, 125 S.Ct. 588. The Court rejected the proposition that "the offense establishing probable cause must be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest". *Id.* at 153, 125 S.Ct. 588

Bellamy's intervening acts constituted crimes and were sufficient to purge any evidence subsequently discovered of the taint of the initial stop. *See, e.g., United States v. Crump,* 62 F.Supp.2d 560, 569 (D.Conn.1999). The revolver and ammunition were discovered during defendant's commission of distinct offenses—assault and resisting arrest—and not as incident to the officers' unlawful *Terry* stop. Accordingly, the revolver and ammunition were lawfully seized and are admissible. The defendant's motion to suppress the revolver and ammunition is denied.

## III. CONCLUSION

For the foregoing reasons, the court grants Bellamy's motion to suppress the marijuana, crack cocaine, and "ziplock" bags containing those drugs and several pieces of paper. The court denies defendant's motion to suppress the Ruger .357 revolver and ammunition. The parties are ordered to appear for a status conference on January 15, 2009 at 10:00 a.m.

**SO ORDERED.**